Argued January 18, affirmed March 7, 1956

## KELITE PRODUCTS, INC. *v.* BRANDT ET AL
294 P. 2d 320

*William A. Martin* argued the cause for appellants. On the briefs were Davis, Jensen & Martin and Donald W. McEwen, of Portland.

*William J. Moshofsky,* of Portland, argued the cause for respondent. With him on the brief were Koerner, Young, McColloch & Dezendorf, of Portland.

Before WARNER, Chief Justice, and TOOZE, LUSK and BRAND, Justices.

TOOZE, J.

This is a suit for injunction, brought by Kelite Products, Inc., a corporation, as plaintiff, against Victor L. Brandt and J. J. Westfall, as defendants, to re-

strain defendants from soliciting or selling to customers of plaintiff products of a competitor substantially the same or identical to the products sold by plaintiff, and for other relief. The trial court entered a decree in favor of plaintiff; defendants appeal.

Plaintiff is a California corporation authorized to transact its business in Oregon. It has been and is engaged in the business of manufacturing, compounding, developing, perfecting, selling and distributing cleaning, scouring, and maintenance compounds, detergents, fluids, compositions, abrasives, polishing and paint removal materials. Plaintiff maintains a place of business in Portland, Multnomah county, Oregon, and through advertising and other means has built up a substantial customer clientele in Portland and vicinity. The business in which plaintiff is engaged is highly competitive, and there are numerous other business concerns in Portland selling products substantially the same as or identical to plaintiff's products.

On October 17, 1950, the defendant Brandt entered into a written contract of employment with plaintiff, whereby Brandt was employed as a service engineer and sales representative for plaintiff in the area in and about the city of Portland (Brandt had signed a similar agreement in 1943). The material portions of the contract are the following:

"In the course of my employment I understand I am likely to become familiar with secret or confidential information of the Corporation, such as, but not limited to, lists of customers, types and kinds of raw materials used by the Corporation, the suppliers and costs thereof, formulae and compounding instructions covering the manufacture of the Corporation's products, and other information of a confidential nature which is required to be

maintained as such for the continued success of the Corporation and its business. Accordingly, I agree

"(a) If employed in a sales capacity, to furnish on demand, at any time during my employment, to Kelite Products, Inc., a complete list of the correct names and places of business of all its customers served by me and located within any or all territories to which I am assigned; immediately notify the Corporation of the name and address of any new customer and report all changes of location of old customers, so that upon the termination of my employment the Corporation will have a complete list of the correct names and addresses of all its customers with which it has dealt.

"(b) If employed in any other capacity during or as a result of which I obtain or am entrusted with any secret information, confidential knowledge or other like data, such as formulae, manufacturing or compounding processes, types and kinds of raw materials used in the manufacture of the Corporation's products, and the suppliers and costs thereof, to at any time, on demand, while so employed, advise and acquaint the Corporation of all such information possessed by or entrusted to me so that it may know at all times the extent to which knowledge of secret or confidential information is possessed and being utilized by me.

"(c) In the event of the termination of my employment, either voluntarily or involuntarily (in either of which events the Corporation, on the one hand, and I on the other, shall be entitled to two weeks notice), to surrender to the Corporation, as a prior condition to my receiving my final wage or salary check, all books, records or notes containing lists of customers, and addresses, served by and assigned to me in any territory, all duplicate invoices or statements pertaining to such customers, and all other information relative to such customers, their needs, the products of the Corporation used by them, the schedules of sales calls upon them, all

formulae, code books, price lists, product manuals and equipment, processing and compounding information or instructions, data applicable to methods of manufacture, types, kinds, suppliers and costs of raw materials, and any other information of a confidential or secret nature applicable to the business of the Corporation, its customers, and the manner of conducting its business.

"(d) That I will not solicit the purchase of industrial chemicals, cleaning compounds or detergents by any of the customers of the Corporation or its successors, either for myself or as an employee of any other person or corporation, nor in any manner attempt to induce any of the customers of the Corporation to withdraw their custom from it or its successors, nor disclose to anyone any secret knowledge or confidential information obtained by or entrusted to me concerning customers, lists thereof, sales procedure, product formulae, processing or compounding information or instructions, methods of manufacture, types, kinds, suppliers and costs of raw materials, or any other like information of which I may be informed or that may be contained in any territory sales book, sales manual, code book, notes, records or documents, either during my employment, after my employment shall cease, or in contemplation of the cessation of my employment, and if I threaten or attempt to do any of the foregoing, then, in any suit that may be commenced by the Corporation, or its successors for the violation of this contract in that respect, I agree that an order may be made in such suit enjoining me from violating any of the provisions of this agreement, and an order to that effect may be made pending the litigation, as well as upon final determination thereof, and said application for such injunction shall be without prejudice to any other right of action which may accrue to the Corporation or its successors by reason of the breach of this contract on my part."

On January 7, 1952, the defendant Westfall entered into a similar written contract with plaintiff; in fact, the two contracts are in precisely the same wording.

When defendants assumed the duties of their employment, there was immediately delivered to them by plaintiff a complete list of plaintiff's then customers located in Portland and vicinity, which showed the dates of purchases made by such customers of plaintiff's products and the types of products purchased. When securing new customers, as well as in selling to old customers, it was the duty of defendants to keep up to date this list and the data therein contained, adding the names of any new customers they secured.

Defendants carried on the duties of their employment in Portland and vicinity until January 3, 1953. Under date of December 20, 1952, by written notice to plaintiff, each defendant formally resigned his position, such resignation to be effective January 3, 1953, and on that date ceased working for plaintiff.

Even before terminating their employment relationship with plaintiff, defendants had arranged to serve as sales representatives of Greater Mountain Chemical Company, a competitor of plaintiff, in and about Portland, and immediately upon termination of their employment with plaintiff became associated with and proceeded to sell the products of Greater Mountain Chemical Company in and about the city of Portland, to customers of plaintiff. We quote from the testimony of defendants. Defendant Brandt on cross-examination, testified as follows:

"Q Now, I believe that you stated that you signed an agreement in 1943? Did you read that agreement?
"A Yes, sir.

"Q And you understand the contents of that?

"A Yes, sir.

"* * * * *

"Q Following the termination of your employment with Kelite did you attempt to solicit or sell to any of Kelite customers products of a competitor?

"A Prior to the serving of the notice, yes.

"Q By that, you mean the restraining order?

"A Yes, sir.

"Q Prior to the restraining order. To how many customers did you sell products; that is, customers of Kelite?

"A I think I answered in the deposition three and that is the figure that is in my mind now.

"Q Do you recall what you sold to those people?

"A I think I can.

"Q Will you tell the Court?

"A Lomac a hot tank material. Mr. Pittman, hot tank material, and Mr. Reimann, drum cleaning material.

"Q Do you recall the numbers or names of these particular products?

"A You mean for the new company?

"Q For the new company?

"A Offhand I can't remember.

"Q Are they products which are for the same purposes as products of Kelite?

"A They are to be used for the same purpose.

"Q Normally you would have sold those accounts had you continued your employment with Kelite Products Company, isn't that correct?

"A Normally.

"Q Isn't it true that a good many of your accounts, or most of them, are what you would consider regular customers; that is, the customers you served while with Kelite, a good number of those people are regular customers of Kelite products?

"A They are regular buyers of certain items.

"Q Isn't it true that the interval, that is, the amount of time between purchases of some of these customers is ordinarily up to a year or so?

"A No.

"Q Isn't it true that it could be, taking, for example, a restaurant which buys a drum of cleaning power [sic] or cleaning solution; they would buy enough, say, to last them for six months or a year, isn't that possible?

"A It is possible.

"Q In fact, it happens quite frequently in the business, doesn't it?

"A Not necessarily because the restaurants don't have space enough to buy that much to store it. Ordinarily the restaurant would rather buy a smaller quantity.

"Q Well, we will say how about from six to nine months; is that a pretty usual interval between purchases for customers of Kelite?

"A Were you speaking about restaurants?

"Q I gave you one example but now let's take any period. As applied to the whole list of customers isn't it true that an interval of six to nine months is not an unusual interval between purchases?

"A It is not unusual to be nine months.

"Q Isn't it true that the information which is contained in Exhibits 28 to 30 [list of customers], that those are the service engineer's record books and are valuable property of Kelite Products, Incorporated?

"A They feel it is valuable.

"Q You would consider the information was valuable to you insofar as your using that information to solicit business for Greater Mountain Chemical, isn't that true?

"A Well, it would help.

"Q *It is your intention, is it not, Mr. Brandt, to solicit these same people that you solicited for*

*Kelite on behalf of Greater Mountain Chemical if that restraining order is lifted,* isn't that correct?

"A Yes, sir.

"* * * * *

"Q Do you know that there a [sic] great number of competitors in this area?

"A Yes, sir.

"Q It is a highly competitive field, is that correct?

"A Yes, sir.

"Q Have you called on any customers other than the Kelite customers you served following the termination of your employment with Kelite?

"A I didn't have time to.

"Q But you did have time to call on Kelite customers?

"A I only had a day and a half time.

"Q You did call on Kelite customers?

"A Yes, sir.

"Q Have you called on any of the trade other than Kelite customers since the restraining order was issued?

"A No, sir.

"Q And served upon you?

"A No, sir.

"Q You haven't attempted to sell to anyone?

"A No, sir."

Defendant Westfall testified as follows on cross-examination:

"Q Now, I believe you have stated that you have had some customers that had followed you for 20 years, is that correct?

"A I said I had customers I had called upon in this list for approximately 20 years.

"Q And it is not unusual in this business for customers to follow the man then, is it, rather than the product?

"A Well, I might put it this way: *If a man has a good product they are pretty apt to follow the man.*

"Q So that taking, two equal products, substantially equal quality, *the customer would usually follow the man if he moved to a different company, isn't that true?*

"A *If the products are equal.*

"Q *Yes.*

"A *Well, if they like that man they would follow him.*

"Q You did get a list of customers from Kelite soon after you went with them? Isn't that correct?

"A A very small list.

"Q *And you have added to that list during the time you have been with them?*

"A *That is correct.*

"Q *Was it your intention upon leaving Kelite to go with Greater Mountain Chemical Company and solicit the same customers you served while with Kelite?*

"A *That was my intention.*

"Q During this period following the termination of your employment with Kelite and the serving of the restraining order I believe about two days later did you attempt to solicit any customers other than customers of Kelite?

"A I did.

"Q How many?

"A I solicited one and I sold him.

"Q But you, during that same period, covered about 20 or 25 customers of Kelite, is that correct?

"A That is correct.

"Q What is your reason for not—you are employed by Greater Mountain Chemical now, isn't that correct?

"A That is correct.

"Q And I understood you to say that you haven't sold any of their products or any products since the restraining order was served?

"A I didn't say that. I said I hadn't called upon customers.

"Q Have you sold any?
"A Yes.

"Q Were they Kelite customers?
"A Yes, they were Kelite customers at one time.

"Q You mean you have sold products of Greater Mountain Chemical to customers since the restraining order?

"A One that called in and asked for materials.

"Q You sold them?
"A That is correct.

"* * * * *

"Q *Do you consider the information contained in the account books which are exhibits 28 to 30—those are the service engineer's account books—of value to Kelite products or to any other company selling similar products?*

"A *They could be of value, yes.*

"Q In fact, they are, aren't they?
"A They don't have much value to me if that is what you are implying.

"Q I asked you as to Kelite.
"A Oh, they would consider them valuable, yes.

"* * * * *

"Q Who were the customers you sold to, that is customers of Kelite that you sold while you were

employed by Greater Mountain Chemical; what are their names?

"A   Concordia College.

"Q   When was that sale made?
"A   I don't remember the exact day but it was prior to the restraining order.

"THE COURT: Prior or after the restraining order?
"A   Prior to the restraining order.

"THE COURT: Well, I thought that counsel was inquiring about after the restraining order.

"Q   (By Mr. Moshofsky:) After the restraining order who did you sell to?
"A   United Tractor Company.

"Q   What was the date of that sale?
"A   This morning.

"Q   That company is a Kelite customer?
"A   Was a Kelite customer. They were my customer before I went to Kelite.

"Q   It is included in the list?
"A   It is included in this list, yes.

"Q   I believe that was Exhibit 25 and 27. Any other customers of Kelite that you sold—what did you sell United Tractor; what products did you sell him?
"A   Steam cleaning compounds.

"Q   How much?
"A   Do I have to answer that question?

"THE COURT: Yes.
"A   Five hundred pounds.

"THE COURT: In dollars and cents.
"Q   (By Mr. Moshofsky:) What was the sale price of that item, total sales price? You sold him 500 pounds. What was the total value?
"A   I would have to figure it up.

"Q  How much is it a pound?

"THE COURT: Go ahead and figure it up. You have been in this business 20 years.

"A  Approximately $90.

"Q  What other sales did you make, since the restraining order, to Kelite customers?

"A  Made a sale to Henry Kels.

"Q  What did you sell him?

"A  Four gallons of carburetor.

"Q  Is that a product similar to one which Kelite sells?

"A  Similar, yes.

"Q  Henry Kels is a former Kelite customer, a Kelite customer that you called upon while you were employed by Kelite?

"A  The last day I was an employee of Kelite I established this account, yes.

"Q  What date was that sale made to Henry Kels, that is, the sale for Greater Mountain?

"A  This morning.

"Q  This morning? Any others?

"A  Not that I recollect." (Italics ours.)

The complaint in this suit was filed on January 5, 1953, and on the same day, plaintiff having filed an undertaking in the sum of $1,500, a temporary restraining order was issued and, on January 6, 1953, served upon defendants, restraining them from soliciting or selling, directly or indirectly, to plaintiff's customers, products substantially the same as or identical to the products of plaintiff, and from inducing customers of plaintiff not to purchase plaintiff's products, and from disclosing or attempting to use certain information.

After trial the trial judge was of the opinion that the contract was unenforceable because it did not pro-

vide specifically for a limitation of time or territory, and because, as stated in the decree, it imposed on each defendant unlimited restriction irrespective of the manner of termination of employment or the length of time of employment. However, the court was of the opinion, as expressed in the decree, that each defendant should be enjoined from using the lists and records of customers referred to in the decree and attached thereto and made a part thereof, or any other records with respect thereto, and then entered the following decree:

"NOW THEREFORE IT IS ORDERED, ADJUDGED AND DECREED that defendant Victor L. Brandt be, and he hereby is, restrained and enjoined for a period of five months from and after January 3rd, 1953, and that defendant J. J. Westfall be, and he hereby is, restrained and enjoined for 60 days from and after January 3rd, 1953, from:

"(a) Soliciting or selling, or attempting to solicit or sell, directly or indirectly, products substantially the same or identical to the products of the plaintiff to customers and patrons of plaintiff who have purchased products from plaintiff within the 8 months next preceding the termination of their employment and whose names and addresses defendants procured and obtained during their employment by the plaintiff, or with respect to which customers and patrons they obtained information while so employed;

"(b) Inducing, or endeavoring to induce, directly or indirectly any of said patrons and customers of plaintiff not to purchase products from plaintiff;

"(c) Disclosing or disseminating, or attempting to disclose or disseminate for or to the benefit of anyone, directly or indirectly, information concerning said patrons and customers to the detriment of plaintiff;

and it is further

"ORDERED, ADJUDGED AND DECREED that Exhibits 50 to 57 inclusive are deemed to be an accurate list of plaintiff's said patrons and customers who have purchased products from plaintiff within the 8 months next preceding the termination of defendants' employment and whom defendants are enjoined from soliciting or selling as above decreed; * * *."

The plaintiff did not cross-appeal.

1. Of course, the time provided in the decree has long since expired, and it has been suggested that the question presented by the appeal is now moot. However, we think otherwise and believe it to be our duty to pass upon the merits of the controversy.

In *Crom v. Frahm,* 33 Idaho 314, 193 P 1013, it is said:

"A motion has been made to dismiss the appeals on the ground that the substance of the controversy between the parties has disappeared, and only a moot question remains to be determined. In support of this motion it is shown that, since the order and judgment appealed from were made and entered, the defendants named in the complaint have ceased to act pursuant to the purported amendments.

"In order to procure the issuance of the injunction respondents were required to give an undertaking in the sum of $1,000, to the effect that they would pay to the parties enjoined such costs, damages, and reasonable counsel fees as they might incur or sustain by reason of the injunction, if the court should finally decide respondents were not entitled thereto. *In view of this obligation it cannot be said the case now before us is without substance,* and the motion to dismiss is overruled." (Italics ours.)

Also see *United Press Ass'n. v. Stockton I. Pub. Co.,* 19 Cal App2d 432, 65 P2d 893; *Jones v. Stauffer,* 49 Idaho 387, 288 P 419; 4 CJ 575, Appeal and Error § 2383, note 80(d); 5 CJS 35, Appeal and Error § 1455.

■ Contracts in general restraint of trade are void and unenforceable, but it is well settled that contracts in partial restraint of trade may be enforceable. In *Eldridge et al. v. Johnston,* 195 Or 379, 403, 245 P2d 239, we said:

"Three things are essential to the validity of a contract in restraint of trade: (1) it must be partial or restricted in its operation either to time or place; (2) it must be on some good consideration; and (3) it must be reasonable, that is, it should afford only a fair protection to the interests of the party in whose favor it is made, and must not be so large in its operation as to interfere with the interests of the public."

■ A contract of employment, whereby an employe agrees that for some period of time after the termination of his employment he will not engage in business in competition with his employer, either as an employee of a competitor or as himself a competitor, if reasonable under all the facts and circumstances of the particular case, may and should be enforced to the extent necessary to protect the interests of the employer.

In 6 Corbin on Contracts 518, § 1394, the following rules are stated:

"It is still in accord with prevailing mores for a dealer or manufacturer or processor of goods to keep secret and to retain the advantage of such special knowledge as he may have of sources of supply, methods of making and selling goods, *names and addresses* of likely customers, and other like matters. If such secret knowledge is entrusted to

an employe, a promise by him not to disclose it to others or make use of it himself is enforceable.

*"Salesmen and solicitors are generally hired and paid a salary in order that they may help build up custom, getting acquainted with customers and acquiring their good will.* A promise to forbear to solicit such customers and to deprive the employer of the advantage of that good will is reasonable." (Italics ours.)

At page 524 of 6 Corbin on Contracts, the author further says:

"As in the case of contracts restraining the seller of a business with its good will, the fact that the restriction on an employee goes too far to be valid as a whole does not prevent a court from enforcing it in part insofar as it is reasonable and not oppressive. The injunction may be made operative only as to reasonable space and time; and it may prevent the disclosure of secrets *or the solicitation of old customers* without requiring the employee to refrain wholly from renewing employment in the same vicinity. *The restrictive promise will be interpreted if possible so as to make the extent and character of its operation reasonable."*

Also see 5 Williston, Contract 4606, § 1643.

Salesmen and solicitors come into actual contact with the customers; they deal directly with them. In making sales their own personalities are expected to and do enter into the matter; their success as salesmen, in large measure, often depends upon their establishing a good will between themselves and the customers. Their employer, who pays them a salary for this purpose, is entitled to the good will which they so establish, and to be protected therein insofar as it may be reasonably necessary to his interests. In the absence of a contractual restriction upon the activities

of a salesman after termination of his employment, courts of equity have often restrained him from entering into unfair competition with his former employer. It is unnecessary for us to discuss the numerous situations where such relief may and should be awarded to a former employer, because here we are dealing with specific contractual obligations.

■ As we said in *Eldridge et al. v. Johnston,* supra, at page 405:

"\* \* \* It is elementary that public policy requires that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred and shall be enforced by courts of justice, and it is only when some other over-powering rule of public policy \* \* \* intervenes, rendering such agreement illegal, that it will not be enforced."

The defendants in this case entered into the contracts in question freely and voluntarily; they read and understood the terms thereof. The termination of their employment was through no act of their employer, but by their own voluntary act, and after giving the notice required by the provisions of the agreement.

Yet, as demonstrated by the record in this case, excerpts of which appear above, defendants, with callous indifference to their solemn contractual undertakings, immediately upon the termination of their employment proceeded to sell to regular customers of plaintiff the competitive products of their new employer; customers with whom they had transacted business as plaintiff's salesmen, and whose names, addresses, and requirements appeared upon the lists furnished defendants by plaintiff and added to by themselves. They seek to avoid the iniquity involved

in their transactions by a technical claim that the contracts which they signed are void because, as they allege, they are unlimited as to territory and time. Equity has but little patience with men who deliberately violate their solemn promises and will enforce their obligations if any reasonable basis therefor may be found.

■ The contract in the instant case must be construed as a whole. From it, we must determine the intention of the parties. It is obvious that plaintiff's chief concern was to prevent defendants upon termination of their employment, either as employes of competitors or for themselves, from soliciting customers of plaintiff with whom defendants had come in contact while employed as salesmen by plaintiff, and whose names appeared upon the lists furnished by plaintiff and added to by defendants in the course of their employment. Such a restriction was not unreasonable under the circumstances, and by the contract defendants agreed to it. All those customers resided in the city of Portland and the immediate surrounding area. The restriction being as to those customers, their places of business in Portland and vicinity, necessarily restricted the territory covered thereby. As to any other purchasers of products similar or identical to those sold by plaintiff, defendants were at liberty to make solicitations and sales, in Portland or elsewhere. Viewing the contract as a whole, we are of the opinion that by its terms there is necessarily implied a restriction as to territory, being governed by the locations of plaintiff's customers in Portland and vicinity, and that such restriction is not unreasonable. *Foss v. Roby*, 195 Mass 292, 81 NE 199, 10 LRA NS 1200.

■ Having found that the contract is limited as to territory and in that respect reasonable, we now come to the consideration of the time element. It is true that

no time limit is set. The question then is: Does the failure to provide a specific limitation as to time render the contract void and unenforceable? We think not.

Where the promise of an employe is not open to objection on the ground that the restraint it imposes is excessive in respect to territorial extent, the agreement will not usually be held to be invalid by reason of the fact that it is without limitation so far as time or duration is concerned. In cases where no limitation of time is provided by the contract, a reasonable time will be implied, and what is reasonable time will depend upon all the facts and circumstances of the case.

In 6 Corbin on Contracts 505, § 1391, it is said:

"If an agreement in restraint of trade or commerce is reasonable and lawful in other respects, it need not be held unlawful for the reason that it specifies no time limit on the period of restraint. This does not mean, however, that reasonableness is not affected by the duration of the restraint; no such restrictive promise should ever be enforced after the justifying reasons for the restraint have ceased to exist. The statement means only that *if no time limit is set by the terms of the agreement, the promise may properly be held lawful and enforceable for a reasonable time.*" (Italics ours.)

See also *Foltz v. Struxness,* 168 Kan 714, 215 P2d 133; *Foss v. Roby,* supra; *United Dye Works v. Strom et ux.,* 179 Wash 41, 35 P2d 760; *John Roane, Inc., v. Tweed,* 33 Del Ch ——, 89 A2d 548, 41 ALR2d 1, and note commencing at page 24 of 41 ALR2d; note in 58 ALR 156, 167.

In the absence of contractual restrictions, it has often been held that an employe who, upon termination of his employment, enters the employ of a competitor of his former employer, is not guilty of unfair competition in selling to customers of his former employer if

the names and places of business of such customers are retained in his own memory or are not taken from private and secret lists furnished him by his former employer, or may be secured by anyone by reference to classified sections of a telephone directory, or by other easily available sources. But where the employe has entered into a specific contract containing restrictions upon his subsequent activities, a different rule is usually applied. The rule applicable to this case is well stated by the author of the note appearing in 9 ALR at page 1468:

> "It is clear that if the nature of the employment is such as will bring the employee *in personal contact with the patrons or customers* of the employer, or enable him to acquire valuable information as to the nature and character of the business and *the names and requirements of the patrons or customers,* enabling him, by engaging in a competing business in his own behalf, or for another, to take advantage of such knowledge of *or acquaintance with the patrons or customers of his former employer,* and thereby gain an unfair advantage, equity will interfere in behalf of the employer and restrain the breach of a negative covenant not to engage in such competing business, either for himself or for another, providing the covenant does not offend against the rule that as to the time during which the restraint is imposed, or as to the territory it embraces, it shall be no greater than is reasonably necessary to secure the protection of the business or good will of the employer." (Italics ours.)

■ Under all the facts and circumstances of this case, plaintiff was entitled to injunctive relief against the wrongful acts of defendants; it was entitled to even more relief as to the period of time of the restraint than awarded by the decree. But having taken no

cross-appeal from the decree, it is presumed that plaintiff was and is satisfied therewith. In the absence of a cross-appeal, we are powerless to increase the duration of the restraint, even if so inclined.

The decree is affirmed. Neither party to recover costs.