Argued April 5, affirmed as modified June 28, 1976

# NORTH PACIFIC LUMBER CO.,
### *Respondent and Cross-Appellant,*
### *v.*
# MOORE, *Appellant.*
551 P2d 431

*Stephen R. Miller* of Robeson & Miller, Lake Oswego, argued the cause and filed briefs for appellant.

*Robert L. Allen* of Morrison, Dunn, Cohen, Miller and Carney, Portland, argued the cause for respondent and cross-appellant. Also on the briefs was G. Kenneth Shiroishi, Portland.

Before O'Connell,* Chief Justice, and McAllister, Denecke,** Holman, Howell and Bryson, Justices.

O'CONNELL, J.

---

*Chief Justice when the case was argued.
**Chief Justice when the case was decided.

## O'CONNELL, J.

This is a suit to enjoin defendants from violating a covenant not to compete contained in a contract of employment entered into between defendant Moore and plaintiff, his former employer. Plaintiff also sought damages from Moore and his new employer, Deep South, for the harm suffered by plaintiff as a result of the breach of the covenant. Moore counter-claimed for commissions earned while he was employed by plaintiff. The trial court granted the relief prayed for against Moore but entered judgment in favor of defendant Deep South. The trial court found in favor of Moore on his counterclaim. Moore appeals and plaintiff cross-appeals from that part of the decree allowing Moore his commissions and from the decree in favor of Deep South.

Plaintiff, a wholesaler of lumber products, hired defendant, David R. Moore, in May of 1969. At this time, Moore had no prior experience in the wholesale lumber industry. It was the policy of North Pacific to hire inexperienced personnel in order to facilitate training and to best effectuate company policies regarding the purchase and sale of lumber products. Accordingly, Moore was hired and trained as a lumber trader specializing in hardwoods.

On May 15, 1969, Moore and North Pacific executed the employment contract here in question, the relevant portions of which are set out in the margin.[1] Summarized, defendant Moore agreed that in the event of

---

[1] "2. * * * In the event of termination of employment by Employee for whatever reason, Employee agrees to refrain from competing, as hereinafter defined, with Employer for a period of time equal to the length of his employment by Employer, or for two (2) years, whichever is lesser.

"* * * * *

"4. The parties understand that Employer would not undertake the expenditure of such sums for training except that Employer anticipates that a large percentage of its trainees will develop as profitable employees and remain as employees of Employer for many years, and thereby acquire, in addition to salary, various benefits given to its employees—for example, bonuses and participation in Employer's profit sharing plan, in accordance

the termination of his employment, he would refrain from engaging in or associating with others in competition with North Pacific for a period of two years within the state of Oregon or within 200 air miles of Portland, Oregon. In addition, Moore agreed that during this period he would not become employed by or associated with, or purchase from, or sell to North Pacific's "regular suppliers or customers," a term which the contract specifically defined.

During Moore's tenure as a hardwood trader he made numerous business trips on behalf of North Pacific in order to purchase lumber, develop new

---

with established standards of Employer, and Employee understands that he is being employed upon a permanent basis subject to proper performance in accordance with Employer's rules, policies and standards.

"5. Employee covenants and agrees that in the event of the termination of his employment, either by himself or by the Employer, for any reason whatsoever, he will refrain from competing with Employer as hereinafter defined, for the period of time hereinbefore provided.

"6. It is agreed between the parties that the following constitute reasonable restrictions and a reasonable definition of 'competition' which shall, as applicable, be deemed in contravention of the terms of this agreement:

"(A) Employee shall not operate as a wholesaler, broker or commission man of forest products, or become employed by or associated in business with others so operating within the boundaries of the State of Oregon and within an area of two hundred (200) air miles from the boundaries of the City of Portland, Oregon, if such forest products are being handled by Nor Pac at the time of termination of Employee's employment.

"(B) Employee shall not, during the restricted period, become employed by or associated in business with or purchase from or sell to Employer's regular suppliers or regular customers as hereinafter defined and limited. Employer's regular suppliers shall be construed to mean suppliers in the United States from whom Employer has purchased during a period of one year immediately preceding termination of Employee's employment with Employer, five (5) orders or more of said forest products, and Employer's regular customers shall be construed to mean customers within the United States, to whom Employer has sold within said one-year period not fewer that five (5) orders of forest products.

"* * * * * Those in the Hardwood Division are restricted to the Hardwood Division only. * * *

"7. Employer estimates that its total customer list is composed of approximately eighty-five thousand (85,000) names. It is anticipated that Employee herein is being restricted with respect to not more than six hundred (600) customers and two hundred (200) suppliers, which the parties agree is a reasonable restriction."

[ 362 ]

sources of supply, and to generally affirm or establish good relationships with existing or potential customers and suppliers. Sometime during one of these trips, in July or August of 1972, Moore personally contacted co-defendant, Deep South Lumber, a hardwood supplier, located in Baton Rouge, Louisiana. Subsequently, Deep South began supplying hardwood to North Pacific on a regular basis, principally through the efforts of Moore. As this relationship between Deep South and Moore continued, discussions transpired which led to negotiations in late 1972 or early 1973 for Moore's employment by Deep South. By September 16, 1973, Deep South and Moore had reached a written agreement. In consideration of Moore's acceptance of its offer of employment, Deep South promised, among other things, to give Moore a substantial ownership interest in Deep South. Deep South was aware of the employment agreement between North Pacific and Moore.

Pursuant to the Deep South-Moore agreement; Moore voluntarily terminated his employment with North Pacific in October of 1973 and commenced his employment with Deep South. Immediately thereafter, Moore began soliciting North Pacific customers on behalf of Deep South from an office which he established in Milwaukie, Oregon. Such activity included the solicitation of customers which were previously handled by the hardwood division of North Pacific including, but not limited to, those customers specifically handled by Moore himself. The hardwood Moore sold those customers was Deep South hardwood which Moore had previously bought from Deep South and sold to the same customers on behalf of North Pacific.

In late August or early September 1974, Moore moved to Louisiana and continued his operations from Deep South's Baton Rouge office. Plaintiff's prayer for damages is limited to those activities of defendants Moore and Deep South which occurred prior to Moore's move to Louisiana.

[ 363 ]

Plaintiff filed the present suit on November 15, 1973. Moore admits that he breached the employment contract, but he contends that the non-competition clause of the contract is not enforceable because plaintiff failed to prove a "protectible interest."

The law governing this issue is stated in *Eldridge et al v. Johnston,* 195 Or 379, 403, 245 P2d 239, 250 (1952):

> "Three things are essential to the validity of a contract in restraint of trade; (1) it must be partial or restricted in its operation in respect either to time or place; (2) it must be on some good consideration; and (3) it must be reasonable, that is, it should afford only a fair protection to the interests of the party in whose favor it is made, and must not be so large in its operation as to interfere with the interests of the public."[2]

Moore contends that plaintiff has failed to establish that the restriction "afford[ed] only a fair protection to the interests of plaintiff.

To be entitled to the protection which a non-competition covenant purports to provide, the employer must show that he has a "legitimate interest" entitled to protection. That interest need not be in the form of a trade secret or a secret formula; it may consist of nothing more than valuable "customer contacts."[3] The principle is stated in *Kelite Prod., Inc. v. Brandt et al,* 206 Or 636, 656, 294 P2d 320 (1956), adopting the following quotation from 9 ALR 1468:

> " 'It is clear that if the nature of the employment is such as will bring the employee *in personal contact with the patrons or customers* of the employer, or enable him to acquire valuable information as to the nature and character of the business and *the names and requirements of the patrons or customers,* enabling him, by engaging in a competing business in his own behalf, or for another, to take advantage of such knowledge of *or*

---

[2] *Accord, Mail-Well Envelope Co. v. Saley,* 262 Or 143, 497 P2d 364, 370 (1972).

[3] Blake, Employee Agreements Not to Compete, 73 Harv L Rev 625, 657 (1960).

*acquaintance with the patrons or customers of his former employer,* and thereby gain an unfair advantage, equity will interfere in behalf of the employer and restrain the breach of a negative covenant not to engage in such competing business, either for himself or for another, providing the covenant does not offend against the rule that as to the time during which the restraint is imposed, or as to the territory it embraces, it shall be no greater than is reasonably necessary to secure the protection of the business or good will of the employer.' "

■ In the present case the evidence demonstrates the importance of developing a personal relationship between the trader and the supplier or customer. Plaintiff established a company policy of encouraging its traders to make personal contact with its customers and to develop a close business relationship with them so that they would turn to plaintiff's employees in seeking to sell or buy lumber. Plaintiff also accumulated data with respect to the particular features of various suppliers of lumber and the type of lumber which filled the special needs of the various buyers.[4] For the most part, the only relationship which the plaintiff had with its customers was through the traders. As pointed out in Blake, Employee Agreements Not to Compete, 73 Harv L Rev 625, 658-59 (1960), "the extent to which the employee is likely to be identified in the customer's mind with the product or service being sold" is an important element in determining the validity of a

---

[4]There are thousands of potential hardwood customers and suppliers. One of the major reasons for the existence of the lumber wholesale business is the difficulty in matching the output of a supplier with the needs of a customer. It is generally more economical for the customer or supplier to buy or sell from the wholesaler than to expend the time and money necessary to procure the information necessary to establish a direct customer/supplier relationship. The information Moore acquired concerning the output of certain suppliers and the needs of various buyers represented a valuable work product. Moore argues, however, that the names of all potential suppliers and customers are readily available in trade publications. [The Lumbermens Red Book (Fall 1973) and Lumber Requirements of Factory Consumers in the United States & Canada, 24th Green Book (Winter 73-74)]. The answer to this is that the information obtained by Moore was not simply the names of sellers and buyers of lumber, but included the requirements of particular customers and the output of particular suppliers. This information is not found in the trade publications

non-competition agreement. The author goes on to say more specifically that:

"* * * The most important factors seem to be (1) the frequency of the employee's contacts with customers and whether they are the employer's only relationships with those customers, (2) the locale of the contact, and (3) perhaps most important, the nature of the functions performed by the employee [the nature of the product or service involved, and the degree of authority and responsibility of the employee]."

Plaintiff has, therefore, established a "protectible interest," based both upon customer contacts and knowledge of customer and supplier names and requirements.

■ Moore contends that even if a legitimate interest is shown, no damages could be awarded absent proof that he knew which of plaintiff's former customers were covered by the formula set out in the contract. He points to the complexity of the contract formula for determining what customers and suppliers Moore would be enjoined from becoming associated with outside the state of Oregon and to the large number of plaintiff's customers.[5] This contention is without merit. The contract restricts Moore from engaging in transactions with a certain class of suppliers and buyers. The restrictions are not limited to situations where Moore knew that the supplier fell within the formula. Absent such a limitation in the contract, it is immaterial that Moore did not know that his conduct constituted a violation.

■■ Moore's final contention is the damage award was speculative. It is well settled that plaintiff is not required to prove the amount of his damages with mathematical certainty. He need only establish the fact of damage and evidence from which a satisfactory conclusion as to the amount of damage can be reached.[6] From the record it appears that Moore, in

---

[5] See Clause 6 of employment contract in footnote 1 supra.

[6] See Brown v. Zimbrick Logging, Inc., 273 Or 463, 541 P2d 1388, 1391 (1975) and cases cited therein.

breach of his contract with plaintiff, made sales to plaintiff's former customers which would otherwise have been made by plaintiff and that plaintiff thereby suffered a loss of profits. We agree with the trial court that Deep South's profits from such sales are a reasonable basis for estimating plaintiff's damages. The trial court's award of damages against Moore is, therefore, affirmed.

We now turn to plaintiff's cross-appeal. Plaintiff assigns as error the trial court's decree in favor of Deep South on plaintiff's second cause of action. Paragraph VI of plaintiff's second cause of action alleged as follows:

> "Defendants, and each of them, by virtue of the employment of Moore by Deep South and by the use of the trade secrets and confidential information of plaintiff and by solicitation, buying from and selling to plaintiff's Hardwood Division suppliers and customers, are knowingly and willfully violating the terms of the agreement, Exhibit A, and are knowingly and willfully unfairly competing with plaintiff in violation of the terms of the agreement, Exhibit A, and Deep South is knowingly and willfully inducing and has induced the breach by Moore of the agreement, Exhibit A."

The trial court dismissed this allegation of plaintiff's complaint against Deep South on the basis of the following finding of fact:

IX.

> "Defendant Deep South Lumber Company was not a party to the contract and therefore is not liable to pay for damages or subject to be restrained as alleged in plaintiff's complaint."

Plaintiff admits that the trial court correctly ruled that it is not entitled to damages for breach of contract against Deep South. However, plaintiff contends that it alleged and proved all the elements of the tort of intentional interference with contractual relations.[7] Plaintiff focuses upon the last nineteen words of its

---

[7] *See generally,* Prosser on Torts § 129 (4th ed 1971).

second cause of action: "and Deep South is knowingly and willfully inducing and has induced the breach by Moore of the agreement, Exhibit A."

Assuming that this allegation of Deep South's inducement of breach of contract by Moore is adequate to apprise Deep South of Plaintiff's intention to assert a cause of action in tort, the commingling of the allegation with the rest of the paragraph reciting "breach of contract" not only by Moore but by Deep South could easily cause the reader to overlook plaintiff's objective, if there was one, of stating both a cause of action in contract and a cause of action in tort in the same paragraph. It is apparent from the findings of fact recited above that Deep South and the trial court were thus confused. It is understandable that they would be because they had a right to expect that the cause of action in tort and the cause of action in contract would be pleaded separately.[8]

Although normally the defendant waives such a pleading defect by failing to file a timely motion to strike, we find no waiver here because defendant did not and could not reasonably be expected to recognize the tort claim in plaintiff's pleading. Plaintiff made no mention of such a claim at any point in the proceeding prior to appeal.[9] There is ground for suspecting that the contention now made is an afterthought. We hold that the trial court did not err in entering a decree in favor of Deep South.

_____

[8] ORS 16.090 provides as follows: "When any pleading contains more than one cause of action or defense, not pleaded separately, such pleading may, on motion of the adverse party, be stricken out of the case."

As stated in *Ausplund v. Haralampus et al,* 193 Or 438, 442-43, 238 P2d 734 (1951): " '[P]arties are presumed to follow the requirements of statute in preparing their pleadings, and a single count or division of a petition will not be construed to state two causes of action unless the purpose of the pleader so to do clearly appears.' " (Quoting from C., R.I. & P. Ry. Co. v. Haywood & Son, 102 Ia 392, 395, 71 NW 358.)

[9] Although plaintiff was not required to take an exception to the finding of fact in question (ORS 17.510), the failure to move to modify the alleged erroneous finding at least suggests the possibility that plaintiff had not at that time regarded its complaint as presenting a claim in tort.

■ Plaintiff also assigns as error in its cross-appeal the trial court's holding in favor of Deep South on plaintiff's first cause of action, which is based upon the theory that Deep South's employment of Moore and consequent sales to plaintiff's former customers constituted the tort of intentional interference with prospective advantage.[10] In order to establish this cause of action, plaintiff was required to prove that Deep South purposely caused a third person not to continue a business relation with plaintiff and that Deep South was not privileged to do so.[11] The privilege of a business competitor is described by 4 Restatement of Torts § 768(1) (1939), as follows:

"(1) One is privileged purposely to cause a third person not to enter into or continue a business relation with a competitor of the actor if

"(a) the relation concerns a matter involved in the competition between the actor and the competitor, and

"(b) the actor does not employ improper means, and

"(c) the actor does not intend thereby to create or continue an illegal restraint of competition, and

"(d) the actor's purpose is at least in part to advance his interest in his competition with the other."

Plaintiff, in essence, contends that Deep South's conduct was not privileged because "improper means" of competition were employed. It is argued that Deep South unfairly made use of trade secrets, customer contacts and confidential information belonging to plaintiff.

■ Plaintiff's allegation that Deep South unfairly used "trade secrets" is not supported by the evidence. The

---

[10] The wrongful conduct alleged in this cause of action is *not* interference with existing contracts between plaintiff and its former customers, but rather inducing these customers to place their new orders with Deep South instead of plaintiff. The cause of action is not intentional interference with contractual relations because there were no contracts with which to interfere. The distinction is recognized in our previous cases. *See, Luisi v. Bank of Commerce,* 252 Or 271, 449 P2d 441, 442 (1969) and *Bliss v. Southern Pacific Co. et al,* 212 Or 634, 651, 321 P2d 324 (1958).

[11] *See,* 4 Restatement of Torts § 766 (1939).

"trade secrets" relied upon were described by plaintiff as certain "business methods and systems" and "customer and market information." Plaintiff failed to prove that it had any secret "business methods and systems." Plaintiff, however, did prove the existence of "customer and market information" consisting of customer cards containing detailed information about each of plaintiff's customers and the lumber transactions between plaintiff and the customer. Assuming, without deciding, that the appropriation and use of information from these cards would be unfair competition, plaintiff is not entitled to relief because it failed to prove that Deep South appropriated information from these cards and there is no contention that Moore copied or removed any of the cards. In light of the large number of cards and the detailed technical entries thereon, it is not believable that Moore memorized the information on the cards. The testimony of the manager of plaintiff's hardwood trading department supports our conclusion that plaintiff failed to prove appropriation of the cards or their contents.[12]

■ Plaintiff, however, did prove that Moore, in breach

[12]"Q. * * * Now, March 8, 1973, you sold Intermountain an order of four quarter, random width and length, first and second, and better red oak, kiln dried, surface two sides, 13/16th, 25 to 30 thousand feet. How much did you sell it to them for?

"A. I don't know. I'd have to refer to the [customer] card. You have it.

"Q. Do you think anybody remembers that information?

"A. I have 600 accounts we sell in our department. There's no way any human could remember all those prices, specifications. That's the reason we keep these cards.

"Q. But this is your account, isn't it?

"A. Yes, it is. That's also a year ago that you're referring to, almost a year ago.

"Q. How would you expect a man to remember this that doesn't even work on your account?

"A. Are you talking about Mr. Moore?

"Q. Mr. Moore.

"A. Mr. Moore has a phenomenally good memory. I will give him credit for that, I will give him more credit for that. Mr. Robeson, I don't maintain that those cards are the sole source of information by virtue of memory.

"Q. Do you have any evidence of the removal or copying of any cards?

"A. I am just not making that indication."

of the non-competition clause of his employment contracts, used customer contacts as well as information he remembered about customers and suppliers. As we have noted, plaintiff had a "protectible interest" in the information and contacts sufficient to justify enforcement of Moore's agreement not to compete. But Deep South was not a party to that contract and its liability, if any, must rest upon some other ground. We are unable to find any other ground upon which to predicate Deep South's liability. *Deep South's* use of the contacts and remembered information through Moore's employment was privileged and *not* an "improper means" of competition.[13] To hold that Deep South could not take advantage of Moore's customer contacts or the names of plaintiff's customers retained in Moore's memory would place too heavy a restriction upon ordinary business competition and also would unduly restrain mobility in the job market.

We hold, therefore, that the trial court correctly denied recovery for the cause of action based upon defendant's intentional interference with plaintiff's prospective advantage.

Finally, on cross-appeal, plaintiff assigns as error the trial court's finding that:

> "As to defendant Moore's separate answer and counterclaim herein the court finds that the intention of the parties as reflected from the evidence together with the evidence of the usual practice in the trade, that Moore was to be paid a 4½% commission on gross trader earnings. That plaintiff has not paid Moore this commission on his gross trader earnings for the year 1973 up to October 5, 1973. That plaintiff is indebted to defendant Moore in an amount to be established through plaintiff's computer as stipulated by the parties."

Plaintiff contends that the evidence establishes that Moore was not employed on a salary plus 4½% commission basis, but rather on a salary plus 4½% year-end bonus arrangement, with employment for the

---

[13] *See, Kelite Prod., Inc. v. Brandt et al,* 206 Or 636, 655-56, 294 P2d 320 (1956).

entire bonus period as a prerequisite to payment of the bonus.

After a careful review of the evidence, we agree with plaintiff. The only testimony concerning the bonus arrangement came from Moore and Mr. Clifford Chulos, a former lumber trader for plaintiff. On cross-examination by plaintiff, both witnesses testified that it was their understanding of the system that no bonus would be paid unless the employee stayed with plaintiff for the entire year in question. Thus, the bonus arrangement amounted to a unilateral contract.[14] Since Moore did not tender the performance sought—continued employment as plaintiff's lumber trader for the entire year—he is not entitled to recover on the contract. The trial court, therefore, erred in awarding Moore damages and attorney fees on his counterclaim.

Affirmed as modified.

---

[14] *Cf., Thompson v. Barr,* 260 Or 329, 490 P2d 157 (1971).