**NIKE, INC., Plaintiff,**

v.

**Eugene R. McCARTHY, Defendant.**

**No. CIV. 03–1128–MA.**

United States District Court,
D. Oregon.

Sept. 29, 2003.

Amy Joseph Pedersen, Karin L. Guenther, Tonkon Torp LLP, Portland, OR, for Plaintiff.

Christopher T. Carson, Kilmer, Voorhees & Laurick, Portland, OR, Steven L. Manchel, Davidson, Manchel & Brennan, Newton, MA, for Defendant.

## OPINION & ORDER

MARSH, District Judge.

Plaintiff filed this action against a former employee seeking temporary and permanent injunctive relief prohibiting defendant from maintaining employment with Reebok, International. Plaintiff seeks specific performance of a written covenant not to compete. On August 26, 2003, I granted plaintiff's motion for a temporary restraining order. On September 23–24, 2003, an evidentiary hearing was conducted on plaintiff's motion for a preliminary injunction. On September 24, 2003, I granted plaintiff's motion for a preliminary injunction. The following constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52 and 65.

### Standards

To obtain a preliminary injunction, plaintiff must demonstrate either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions are raised and the balance of hardships tips

sharply in favor of the moving party. *Tillamook County v. U.S. Army Corps of Engineers,* 288 F.3d 1140, 1143 (9th Cir. 2002); *Sardi's Restaurant Corp. v. Sardie,* 755 F.2d 719, 723 (9th Cir.1985). These are not two distinct tests, but rather are opposite ends of a single "continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1217 (9th Cir.1987) (citations omitted).

### Discussion

First, I note at the outset that this case involves enforcement of a contract. The contract calls for the defendant not to work for any Nike competitor for a 1–year period following severance from his employment with Nike. The contract is plain and unambiguous and does not, in any way, depend upon the reasons for defendant's severance with the company. Whether defendant left voluntarily or was forced to resign is of no moment; however, I find from the evidence presented that the defendant left his position with Nike voluntarily.

Nike is seeking specific enforcement of this contract. Under the plain language of the contract they would be entitled to relief. However, under Oregon law (ORS 653.295), we must engage in an additional inquiry to determine whether enforcement of this contract would be unfair because defendant was compelled to execute the agreement *after* receiving a bona fide advancement rather than contemporaneous with that decision. Oregon law requires that a non-competition agreement be entered into "upon" a bona fide advancement. Execution of a non-competition agreement with an employee at any time after an initial hiring or promotion is ineffective. *See IKON Office Solutions, Inc. v. American Office Products, Inc.,* 178 F.Supp.2d 1154 (2001) (invalidating non-competition contract executed 17 days after employment commenced), *aff'd* 61 Fed. Appx. 378 (9th Cir.2003).

### Findings

The defendant has been employed by Nike in various capacities for the last twenty years. In June of 1995, defendant became a Key Account Sales Manager (KAM) in Philadelphia, Pennsylvania. Up until his KAM position, defendant had not been asked to execute any non-competition agreements as a condition of his employment. He did sign such an agreement after receiving the KAM job. In late February or early March of 1997, defendant was approached by his immediate superior, John Petersen about a promotion to the position of Regional Footwear Sales Manager (RFSM) for the eastern region.

There is no dispute that:

(a) McCarthy received a "bona fide promotion" in the Spring of 1997;

(b) McCarthy's salary increase for his new position became effective April 1, 1997;

(c) His salary increased and his job duties and responsibilities were expanded with his new title of Regional Footwear and Sales Manager;

(d) McCarthy received and signed the non-compete agreement on March 27, 1997.

Defendant was hired by Peterson as part of a new, reorganized team at a time when Nike was undergoing a significant company-wide management reorganization.

Testimony elicited at the preliminary injunction hearing establishes that defendant did begin to perform some of his new job duties in March of 1997; I also find that Brian Forde, defendant's predecessor in the Regional Footwear Sales Manager position, performed some of the duties of his

new job with the WWC in March of 1997. Both Forde and McCarthy performed some of the duties of their previous jobs throughout March of 1997. All of this evidence lends support to plaintiff's contention that job changes in the upper echelons of the Nike management structure involved a "transitional period."

In the summer of 1999, defendant was promoted to the position of Global Sales for Brand Jordan.[1] In late April of 2003, defendant became dissatisfied with his job and he received indication from Larry Miller, President of the Jordan Division, that he would probably be re-assigned to some other division or position within the company. Defendant feared a demotion, but Miller testified that his intent was to transfer defendant to another comparable position.

In April of 2003, defendant began talks with Reebok about a possible job. On April 17 and May 27, 2003, defendant traveled to Reebok's headquarters in Canton, Massachusetts for interviews. On May 30, 2003, defendant received a formal written offer of employment with Reebok for the position of Vice President, U.S. Footwear Sales & Merchandising. Defendant told Bob Munroe of Reebok that he did not have a non-competition agreement with Nike, however, Reebok agreed to provide legal counsel to McCarthy in the event Nike attempted to prevent his employment with Reebok.

There is a direct conflict in the testimony of the defendant and Cathy Redmond, Nike's HR Director for Brand Jordan about what defendant knew about his non-competition agreement and when he knew it. I find the testimony of Cathy Redmond regarding her discussions with the defendant about his non-competition agreement fully credible. I find that the defendant was aware of the fact that he had a non-compete agreement with Nike by the time of his negotiations with Reebok and that Ms. Redmond attempted to provide him with a copy of that agreement within a few days of his initial inquiry. Thus, there is no unfairness or undue surprise to the defendant by Nike's decision to enforce the agreement.

On June 12, 2003, defendant notified Nike of his intent to resign. He submitted a written letter to this effect on June 18, 2003. On July 2, 2003, Nike sent a written response advising defendant that it intended to hold him to the terms of his non-competition agreement.[2]

I find that Nike has established that it had legitimate reasons for insisting that defendant sign a non-competition agreement given the nature of defendant's former position with Nike and his access to sensitive and confidential marketing and product information. The fact that defendant may not have used any confidential information in his new position with Reebok only shows that he has not violated other provisions of the non-compete agreement. What remains is that the parties agreed to abide by the terms of the non-compete regardless of any demonstrated specific need. I allowed consider-

1. Defendant did not sign a new non-competition agreement with respect to this promotion; by its own terms, his prior non-competition agreement applied from the date of execution through his entire employment with Nike.

2. There was some testimony that Oscar Cardona, Nike's Vice–President of Human Resources for U.S. Region, recommended that defendant's non-competition agreement not be enforced. It is unclear as to whether this was ever communicated to the defendant; in any event, there is no question that Cardona's recommendation was not accepted by George DeStefano, Nike's President of U.S. Operations. The official word from Nike to the defendant was consistent: the non-competition agreement would be enforced.

able leeway in the testimony and evidence regarding the circumstances surrounding defendant's separation from Nike and his assumption of duties with Reebok for the limited purpose of determining whether enforcement of the contract would be unconscionable and I find nothing to support such a conclusion.

Similarly, the fact that defendant may have been forced out of the company bears no direct relation to the validity of the contract—the severance pay package alleviates any unfairness, unconscionability or "unclean hands" in enforcing the non-compete for a 1–year period. Further, nothing in the terms of the contract invalidates its provisions based upon the voluntary or involuntary nature of defendant's separation from the company.

**Conclusions of Law**

 Unlike the relatively simple question of deciding when an employee commences an initial term of employment, determining exactly when a current employee advances within the company necessarily involves a number of considerations.[3] I find that the legal definition of when a bona fide advancement is effective depends upon several factors: (a) the date the offer was made and whether the offer was expressly contingent upon any other factors; (b) the date of acceptance and whether acceptance was contingent upon any other factors; (c) the company's standard practices and procedures relative to promotions; (d) title change; (e) an enhancement in job duties and responsibilities; and (f) an enhancement in pay and/or the benefit package.

 Defendant correctly notes that under Judge King's opinion in *First Allmerica v. Sumner*, 212 F.Supp.2d 1235 (D.Or. 2002), an increase in pay or benefits, standing alone, will not constitute a bona fide advancement. However, the issue here is timing not whether there has been a bona fide advancement. I understand that, given the realities of corporate structure, culture and frequent corporate reorganizations, that pinning down a particular time may be problematic because the relevant factors may be fluid. Job duties may vary and tasks outside of the strict definition of an employee's job title may be assigned as the employee transitions into the new position. But the fact that, for example, I ask my law clerk to file a document does not change her job title from that of a law clerk to a docket clerk. Like a president-elect putting together his cabinet—the nominations are made, but the Secretary of State doesn't become the Secretary until the President is actually sworn in. Any job related announcements made in mid-March would necessarily have been anticipatory regardless of how they were worded publicly. For purposes of analyzing the statute, I find that an enhancement in job duties and responsibilities, a change in job title and a change in pay or benefits must converge to constitute the triggering date for a "subsequent bona fide advancement" within the meaning of ORS 653.295. An increase in pay standing alone will not suffice; a change in job responsibilities standing alone will not suffice; and a change in job title, standing alone, will not suffice—all of these elements must come together to constitute a bona fide advancement within the meaning of the Oregon statute.

In this case, there is evidence that defendant was offered the job of Regional Footwear Sales Manager in late February or early March. This job offer took place during a period that all of the witnesses

---

**3.** The parties candidly acknowledge that there is no Oregon case law interpreting the pertinent provisions of O.R.S. 653.295.

have described as a "significant" reorganization. Defendant orally accepted the offer immediately. There is evidence that shortly thereafter, defendant began to assume some of the duties and responsibilities of his new job and that he charged expenses to the RFSM cost center.

While the testimony is equivocal, there is also some evidence that defendant was "presented" to other employees by John Petersen as the new RFSM at a meeting in mid-March. A March 25, 1997 letter and payroll documents indicate that the promotion would be effective April 1, 1997. Further, the March 25, 1997, letter makes clear that the promotion was contingent upon defendant's execution of the non-compete. Evidence adduced at the hearing reveals that this was standard procedure for Nike—that employees would begin to perform job duties as part of a transition. This was particularly true in this circumstance given the large-scale reorganization taking place within Nike at that time. Brian Forde, plaintiff's predecessor, continued to perform at least some the job duties of the RFSM throughout the Spring of 1997. Defendant also continued to be paid based upon his prior job as a KAM, including commissions for March sales. It was standard practice for Nike to require higher level management employees to sign non-compete contracts as a condition of any promotion and defendant was well aware of this practice. Defendant signed the non-compete agreement on March 27, 1997, and his salary increase went into effect on April 1, 1997. The salary change also coincides with Nike's change in budget allocation for the salary; allocation to the new job simply confirms that defendant was in fact performing some of his job duties in March of 1997.

Any attempt to pinpoint a date of hire prior to April 1, 1997, is problematic. Defendant claims that he was hired on February 28th and March 3 and he also relied upon the testimony of Jane Patterson who thought he was hired during a sales and merchandising meeting in Kansas City in mid-March. The only solid date we have appears in the HR records maintained by Nike in the ordinary course of business. April 1, 1997 is the date defendant began receiving his new salary, it is the date that he became fully responsible for his new job duties and it is the "effective" date according to John Petersen, the person who gave defendant the promotion.

Considering all of the circumstances surrounding defendant's promotion to the Regional Footwear Sales Manager position in the Spring of 1997, I find that he did in fact execute the non-competition agreement at the commencement of his promotion effective April 1, 1997. Accordingly, the agreement is valid under Oregon law and fully enforceable.

I find that plaintiff has demonstrated a high likelihood of success on the merits and that the balance of hardships favors the granting of a preliminary injunction for the remainder of this case. Plaintiff has a valid interest in enforcement of the non-competition contract given the nature of the defendant's prior job duties and his access to confidential, valuable and proprietary information. Further, given that the agreement only prohibits the defendant from working with any Nike competitor for a 1–year period and defendant is paid in full for a year, enforcement does not pose any significant hardship upon the defendant. Furthermore, Reebok has contractually bound itself to hold defendant's job open for a one-year period should Nike succeed in its efforts to enforce the 1–year non-competition agreement. If defendant wants to work over the next year, he may do so in any other industry but the athletic footwear, apparel or sports equipment and accessory business. Accordingly, plain-

tiff's application for a preliminary injunction is GRANTED. The order entered on August 26, 2003 is continued through August 25, 2004, as follows:

Defendant Eugene R. McCarthy is enjoined from:

(a) engaging in employment with Reebok or any of its affiliates or subsidiaries;

(b) otherwise joining or participating in Reebok's business; and

(c) Engaging in any athletic footwear business, athletic apparel business, or any other business which directly competes with Nike or any of its subsidiaries or affiliated corporations.

The bond of $50,000 previously posted by the plaintiff shall remain in place pending a full resolution of this action on the merits.

IT IS SO ORDERED.