NIKE, INC., Plaintiff–Appellee,

v.

Eugene McCARTHY, Defendant–Appellant.

No. 03–35818.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 4, 2004.

Filed Aug. 9, 2004.

---

Steven L. Manchel, Manchel & Brennan, P.C., Newton, MA, and Christopher T. Carson, Kilmer, Voorhees & Laurick, P.C., Portland, OR, for the defendant-appellant.

Scott G. Seidman, Tonkon Torp LLP, Portland, OR, for the plaintiff-appellee.

Before: HUG, McKEOWN and FISHER, Circuit Judges.

FISHER, Circuit Judge:

In this case we must determine the validity of a noncompete agreement under Oregon law. Eugene McCarthy left his position as director of sales for Nike's Brand Jordan division in June 2003 to become vice president of U.S. footwear sales and merchandising at Reebok, one of Nike's competitors. Nike sought a preliminary injunction to prevent McCarthy from working for Reebok for a year, invoking a noncompete agreement McCarthy had signed in 1997 when Nike had promoted him to his earlier position as a regional footwear sales manager. Under Oregon law, which governs here, a noncompete agreement generally is void and unenforceable unless agreed to "upon" either the employee's initial employment or—relevant here—the "[s]ubsequent bona fide advancement of the employee with the employer." Or.Rev.Stat. § 653.295(1)(b) (2004). McCarthy's promotion to regional footwear sales manager was undisputedly an "advancement"; the critical issues are *when* the advancement occurred and whether Nike obtained McCarthy's agreement not to compete *"upon"* that advancement. Construing the Oregon statute and reviewing the circumstances surrounding McCarthy's promotion and the execution of the noncompete agreement, we hold that the agreement meets the statutory requirements to be enforceable. We also hold that Nike has a legitimate interest in enforcing the agreement, because there is a substantial risk that McCarthy—in shaping Reebok's product allocation, sales and pricing strategies—could enable Reebok to divert a significant amount of Nike's footwear sales given the highly confidential information McCarthy acquired at Nike. Thus, we affirm the district court's preliminary injunction enforcing the agreement.

## I. FACTUAL AND PROCEDURAL BACKGROUND

McCarthy began working for Nike in 1993 and became a key account manager in

1995.[1]  During the spring of 1997, Nike undertook a major, national reorganization.  Out of this came McCarthy's promotion to eastern regional footwear sales manager—and the present dispute as to when that promotion actually occurred.  On February 28, John Petersen, McCarthy's supervisor, called McCarthy and asked, "How would you like to be the regional footwear sales manager for the eastern region?"  McCarthy answered, "Absolutely, yes."  Petersen mentioned there would be an increase in pay but did not say what the salary would be.[2]

In the following weeks, McCarthy continued to perform some of his old duties while assuming some of the duties of his new position, including leading meetings and preparing a report.  In order to perform these duties, McCarthy obtained confidential information he had not seen before that described the top-selling styles in the eastern region.  During the week of March 10, Petersen announced to a group of employees that McCarthy was the new regional footwear sales manager.  During the remainder of March, McCarthy took several business trips, which were expensed to the cost center for the regional footwear sales manager position.[3]

On March 27, McCarthy received a letter from Petersen confirming the offer for the regional footwear sales manager position ("Offer Letter").  The letter indicated that the "start date" for the new position was April 1, 1997.  According to several Nike executives, it is not unusual for an employee to begin to perform the duties of a new position prior to the start date, in order to ensure a smooth transition once he or she "officially" starts in the new position.  The Offer Letter also specified that McCarthy's salary would be $110,000, which became effective April 1. Before that date, McCarthy's salary was charged to the cost center for the key account manager position.

In addition, the Offer Letter required McCarthy to sign an attached covenant not to compete and nondisclosure agreement as a condition of acceptance of the offer.  The covenant not to compete contained the "Competition Restriction" clause at issue here, stating in relevant part:

> During EMPLOYEE'S employment by NIKE ... and for one (1) year thereafter, (the "Restriction Period"), EMPLOYEE will not directly or indirectly ... be employed by, consult for, or be connected in any manner with, any business engaged anywhere in the world in the athletic footwear, athletic apparel or sports equipment and accessories business, or any other business which directly competes with NIKE or any of its subsidiaries or affiliated corporations.

McCarthy signed the agreement that day.  It is this noncompete agreement that Nike now seeks to enforce.

Two years later, McCarthy was again promoted, this time to the position of director of sales for the Brand Jordan division, the position he held until he resigned from Nike in June 2003.  He was not asked to sign a new noncompete agreement.  During the spring of 2003, McCarthy accepted a position with Reebok as vice president of U.S. footwear sales and merchandising and tendered his resigna-

---

1.  McCarthy signed a covenant not to compete as part of his employment agreement for the key account manager position, but that is not the noncompete agreement at issue here.

2.  Petersen testified that he did not have actual authority to offer McCarthy the position at that time but rather was calling to see if McCarthy would be interested in the position.

3.  Each position at Nike has a cost center or "GL No." associated with it.  Salary and expenses are charged to that cost center for budget purposes.

tion in June. McCarthy began working at Reebok on July 22, 2003.

On August 18, 2003, Nike filed suit in Oregon circuit court, claiming breach of contract and seeking a declaratory judgment that McCarthy's employment with Reebok violated the covenant not to compete. McCarthy removed the case to the United States District Court for the District of Oregon, which had jurisdiction pursuant to 28 U.S.C. § 1332. Nike then moved for a temporary restraining order, which the district court granted on August 26. After conducting an evidentiary hearing, the court granted Nike's motion for a preliminary injunction on September 24. Specifically, the court enjoined McCarthy from "engaging in any athletic footwear business, athletic apparel business, or any other business which directly competes with Nike or any of its subsidiaries or affiliated corporations," including Reebok, through August 25, 2004. *Nike, Inc. v. McCarthy,* 285 F.Supp.2d 1242, 1248 (D.Or.2003). McCarthy appeals the grant of the preliminary injunction.

## II. STANDARD OF REVIEW

We review the district court's decision to grant a preliminary injunction for an abuse of discretion. *See Walczak v. EPL Prolong, Inc.,* 198 F.3d 725, 730 (9th Cir.1999). A district court abuses its discretion if it bases its decision on either an erroneous legal standard or clearly erroneous factual findings. *Id.* The district court's decision is based on an erroneous legal standard if it (1) did not apply the correct preliminary injunction standard or (2) misapprehended the law with respect to the underlying issues in the litigation. *Id.*

## III. PRELIMINARY INJUNCTION

To obtain a preliminary injunction, Nike must show either (1) "a likelihood of success on the merits and the possibility of irreparable injury" or (2) "the existence of serious questions going to the merits and the balance of hardships tipping in [Nike's] favor." *Gilder v. PGA Tour, Inc.,* 936 F.2d 417, 422 (9th Cir.1991). "These two alternatives represent extremes of a single continuum, rather than two separate tests. Thus, the greater the relative hardship to [Nike], the less probability of success must be shown." *Walczak,* 198 F.3d at 731 (internal citation and quotation marks omitted). We conclude that Nike has demonstrated a likelihood of success on the merits and the possibility of irreparable injury from McCarthy's employment with Reebok.

## IV. VALIDITY OF THE NONCOMPETE AGREEMENT

### A. Oregon Revised Statute § 653.295(1)

We first address the merits of Nike's claims. McCarthy contends that the covenant not to compete is void under Oregon Revised Statute § 653.295(1), which provides:

A noncompetition agreement entered into between an employer and employee is void and shall not be enforced by any court in this state unless the agreement is entered into upon the:

(a) Initial employment of the employee with the employer; or

(b) Subsequent bona fide advancement of the employee with the employer.

Or.Rev.Stat. § 653.295(1) (2004). As applied to McCarthy's situation, the statute requires that (1) there was a "bona fide advancement" of McCarthy and (2) that the noncompete agreement was "entered into upon" that bona fide advancement. *Id.* Although the parties agree that McCarthy's promotion to regional footwear sales manager involved an advancement within Nike, they disagree as to *when* the

advancement occurred. McCarthy contends Nike did not obtain his consent to the noncompete agreement "upon" his advancement but well after it had already been implemented, and thus the agreement came too late to be enforceable under the statute. Understanding what the statute contemplates by way of a bona fide advancement will help shed some light on how to determine when an employee's advancement has occurred so as to justify an employer securing a noncompete agreement.

### 1. Meaning of bona fide advancement

█ The district court construed "bona fide advancement" as follows:

> [A]n enhancement in job duties and responsibilities, a change in job title and a change in pay or benefits must converge to constitute the triggering date for a "subsequent bona fide advancement" within the meaning of ORS 653.295. An increase in pay standing alone will not suffice; a change in job responsibilities standing alone will not suffice; and a change in job title, standing alone, will not suffice—all of these elements must come together to constitute a bona fide advancement within the meaning of the Oregon statute.

*Nike*, 285 F.Supp.2d at 1246. McCarthy argues that the district court erred in interpreting bona fide advancement as requiring the convergence of all the listed elements. We agree with McCarthy to that extent, but believe the district court nonetheless reached the right result.

Although Oregon courts have interpreted section 653.295 before, they have not yet construed the meaning of "bona fide advancement." In the absence of a controlling interpretation by the Oregon Supreme Court, we must construe the term as we believe the Oregon Supreme Court would. *See Gravquick A/S v. Trimble Navigation Int'l Ltd.*, 323 F.3d 1219, 1222 (9th Cir.2003). When interpreting an Oregon statute, "the court's task is to discern the intent of the legislature." *Portland Gen. Elec. Co. v. Bureau of Labor & Indus.*, 317 Or. 606, 859 P.2d 1143, 1145 (1993). The "first level of analysis" is to "examine[ ] both the text and context of the statute." *Id.* at 1146. "[T]he text of the statutory provision itself is the starting point for interpretation and is the best evidence of the legislature's intent." *Id.* In trying to ascertain the meaning of the text, the Oregon Supreme Court adheres to certain rules of statutory construction, such as "the rule that words of common usage typically should be given their plain, natural, and ordinary meaning." *Id.* The court also considers "the context of the statutory provision at issue, which includes other provisions of the same statute and other related statutes." *Id.* "If the legislature's intent is clear from the ... text and context, further inquiry is unnecessary. If, but only if, the intent of the legislature is not clear from the text and context inquiry, the court will then move to the second level, which is to consider the legislative history to inform the court's inquiry into legislative intent." *Id.*[4]

---

4. In 2001, the Oregon legislature amended Oregon Revised Statute § 174.020, which governs the construction of statutes by the Oregon courts, to provide that "a party may offer the legislative history of the statute" to "assist a court in its construction of a statute" and that "[a] court shall give the weight to the legislative history that the court considers to be appropriate." 2001 Or. Laws 438 § 1. In

*Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1114 n. 7 (9th Cir.2003), we assumed without deciding that the amendments to § 174.020 did not alter the statutory interpretation methodology set out in *Portland General Electric Co. v. Bureau of Labor & Industries* ("*PGE*"), 317 Or. 606, 859 P.2d 1143 (1993). Because we conclude that the intent of the Oregon legislature is not clear from the text

The text and context of section 653.295(1)(b) do not clearly indicate what constitutes a bona fide advancement. The statute does not define the term, nor does it appear in other provisions of the same statute or other related statutes. Therefore, we look to the plain, natural and ordinary meaning of the words. "Bona fide" is defined as "made or carried out in good faith; sincere." The American Heritage College Dictionary 158 (3d. ed.2000). An "advancement" is "[a] forward step; an improvement," "[a] promotion, as in rank." *Id.* at 19.

Obviously, these definitions leave room for debate about what constitutes a bona fide advancement. In resolving this ambiguity, we find some helpful indicators of legislative intent in the statute's legislative history. In 1977, the Oregon legislature enacted section 653.295, which at that time provided that noncompete agreements were void unless entered into only at the time of initial hiring. The purpose was "to prevent an employer from imposing a new agreement on an old employee as an additional requirement of continuing in the same job." *Hearing on S. 748 Before the S. Comm. on Bus. & Consumer Affairs,* 1983 Leg., 62d Sess. (Or.1983) (summary of testimony of Donald Miller, President of Les Schwab Tire Co., and Milo Ormseth, attorney for Les Schwab)[hereinafter *Miller/Ormseth testimony* ].

Apparently responding to concerns that foreclosing noncompete agreements later in an employee's career created undesirable results for employers and employees, the Oregon legislature amended section 653.295 in 1983 to permit non compete agreements to be entered "upon the subsequent bona fide advancement" of an employee within the company.[5] Testimony before the Oregon Senate Committee on Business and Consumer Affairs explained that, under the proposed bill, "[t]he employer still could not surprise the old employee with a new requirement, but the employer could impose the noncompetion agreement as a condition of advancing to a higher position in which there is a real need and justification for a noncompete obligation." *Miller/Ormseth testimony, supra.* Similar testimony given before the Oregon House Committee on Labor stated, "The employee will still be protected against new conditions for the same job,

and context inquiry, resort to legislative history is permissible under the *PGE* methodology, and we do not need to decide whether § 174.020 would otherwise permit the consideration of legislative history. However, we note that Oregon appellate courts have continued to apply the *PGE* methodology subsequent to the 2001 amendments and have looked to legislative history only if the intent of the Oregon legislature is not clear from the text and context of the statute. *See, e.g., Labor Ready Northwest, Inc. v. Bureau of Labor & Indus.,* 188 Or.App. 346, 71 P.3d 559, 566 (2003) ("We may consider legislative history only if the intent of the legislature is not clear from the text and context inquiry."); *Smith v. Salem–Keizer Sch. Dist.,* 188 Or.App. 237, 71 P.3d 139, 143 (2003) (declining to delve into the legislative history "because the legislature's intent ... is clear from the text and context of the relevant statutes").

5. According to testimony before the state legislature, the 1977 law forced employers to make one of four undesirable choices. First, an employer could make all its new employees sign a noncompete agreement to ensure that those few who were later promoted to positions that would involve access to confidential information would be covered by a noncompete agreement. Second, an employer might not advance its employees from within but instead hire employees laterally into positions that exposed them to confidential information. Third, businesses that were national in character could move such jobs to states with more employer-friendly noncompete laws. Fourth, an employer might forsake noncompetition protection altogether even if it had a legitimate interest to protect. *Miller/Ormseth testimony, supra.*

but the employer will be able to obtain protection upon advancing the employee to a higher position in which a noncompete obligation is reasonably required." *Hearing on H. 2853 and S. 748 Before the H. Comm. on Labor*, 1983 Leg., 62d Sess. (Or.1983) (summary of testimony by Donald Miller and Charles Hinkle)[hereinafter *Miller/Hinkle testimony* ]. This testimony also indicated that "this Bill will improve the business climate in the State of Oregon. Employers will be free to locate sensitive employment positions here and still require reasonable noncompete agreements from advancing employees." *Id.*

In light of this history, it is apparent that the legislature intended to permit employers to require existing employees to agree to a noncompete agreement, so long as the employee's job content and responsibilities materially increased and the employee's status within the company likewise improved. Otherwise, the employer would merely be imposing a new condition for the "same job." *Id.* Thus, an advancement would ordinarily include such elements as new, more responsible duties, different reporting relationships, a change in title and higher pay.[6]

In McCarthy's case, his promotion included all of these elements. He received a new title of regional footwear sales manager and was presented to other employees as such. He undertook new duties associated with the new position, assumed a new supervisory role over other sales representatives and received a higher salary of $110,000. The issue remains, however, as to when his "advancement" occurred for purposes of triggering Nike's limited opportunity to obtain a binding noncompete agreement "upon" McCarthy's advancement.

2. *Meaning of "upon ... the advancement"*

■ *McCarthy's advancement consisted of multiple elements* that played out over several weeks, with his promotion not being formalized until he received his Offer Letter with the accompanying noncompete agreement on March 27, 1997, and his pay increase not effective until April 1. In such circumstances, the question arises as to when a noncompete agreement must be entered into relative to this process of advancement. All the statute tells us is that the agreement must be "entered into upon the ... bona fide advancement of the employee with the employer." Or.Rev. Stat. § 653.295(1).

McCarthy argues that a noncompete agreement must be entered into as soon as the employee takes on any of the duties of the new position. Such an inflexible rule, however, would put employers at risk of losing their noncompete option during a period of "auditioning" an employee for possible promotion and thus could hinder the advancement of employees from within a company, a concern that prompted the

---

**6.** For example, in *First Allmerica Financial Life Insurance Co. v. Sumner*, 212 F.Supp.2d 1235 (D.Or.2002), the employer hired two employees in 1981 and 1993, respectively. In 1996, they both signed revised employment agreements, which increased the amount of their compensation, provided new severance benefits packages and contained noncompete clauses. Their duties, however, did not change. *Id.* at 1240. In finding the noncompete agreements void under § 653.295 because they were not executed upon a bona fide advancement, the court reasoned "that a 'bona fide advancement' necessarily requires an increase or improvement in job status or responsibilities that justifies a change in the way the employer entrusts client contacts and business related information with the employee. Simply offering the employee more money, a more favorable compensation package or certain benefits is insufficient to constitute a bona fide advancement, absent some proof of a change in actual job status or responsibilities." *Id.* at 1241.

state legislature to amend the statute in 1983.[7]

On the other hand, the statute and its legislative history make clear the process is not open-ended. The legislative history suggests that the employer and employee would likely come to some agreement or understanding on the terms and conditions of the new job, in the process of which the employer would inform the employee of the need for a noncompete agreement as a condition of the advancement. This would be consistent with affording employees the intended protection against "surprise" and imposition of "new conditions." *Miller/Ormseth testimony, supra; Miller/Hinkle testimony, supra*. For similar reasons, the legislative history implies that an employer should not spring a noncompete agreement on an employee long after the commencement of the advancement process—for instance by unreasonably delaying a pay increase or title change, or deferring consummation of the employer's and employee's agreement on the terms and conditions of the new job. In short, although a noncompete agreement need not be entered into at the first instance that the employee assumes any elements of the new job, including new duties, neither does the window of opportunity to ask for a noncompete agreement remain open until the employer sees fit formally to finalize the advancement process.

■ Although the district court applied a bright line rule that would require all of the elements of the advancement to "converge" before an employer must obtain a noncompete agreement, we need not adopt its test in order to resolve the case before us. Under either a totality of the circumstances test or a bright line rule, McCarthy's noncompete agreement would be enforceable under section 653.295. McCarthy signed the noncompete agreement on March 27 in conjunction with reaching a final agreement on the terms and conditions of his new job, and his pay increase did not take effect until April 1. Moreover, McCarthy's advancement evolved over a reasonably short period of time, with no unreasonable delays by Nike in finalizing the process. For these reasons, we conclude that the district court did not err in finding that McCarthy's noncompete agreement was "entered into upon" his bona fide advancement.

## B.  Protectible interest

■■ Even if the covenant not to compete is not void under section 653.295, it is a contract in restraint of trade that must meet three requirements under Oregon common law to be enforceable:

(1) it must be partial or restricted in its operation in respect either to time or place;  (2) it must be on some good consideration;  and (3) it must be reasonable, that is, it should afford only a fair protection to the interests of the party in whose favor it is made, and must not be so large in its operation as to interfere with the interests of the public.

*Eldridge v. Johnston*, 195 Or. 379, 245 P.2d 239, 250 (1952).  To satisfy the reasonableness requirement, the employer

---

**7.**  McCarthy also argues for a rule that would require that a noncompete agreement be entered into as soon as the employee is given access to confidential information the employer wishes to protect.  However, § 653.295(1)(b) conditions a noncompete agreement upon a bona fide advancement, not access to confidential information. McCarthy's reliance on *Sumner* is misplaced.

Contrary to McCarthy's characterization, the court did not hold that an advancement occurs at the moment that an employee is given access to confidential information.  Rather, the court held that *no* advancement has occurred when the employee is given an increase in pay but no correlative change in responsibilities or status.  *Sumner*, 212 F.Supp.2d at 1241.

must show as a predicate "that [it] has a 'legitimate interest' entitled to protection." *North Pac. Lumber Co. v. Moore*, 275 Or. 359, 551 P.2d 431, 434 (1976). McCarthy argues that Nike has failed to show such a legitimate interest in this case.[8]

■ McCarthy's general skills in sales and product development as well as industry knowledge that he acquired while working for Nike is not a protectible interest of Nike's that would justify enforcement of a noncompete agreement. "It has been uniformly held that general knowledge, skill, or facility acquired through training or experience while working for an employer appertain exclusively to the employee. The fact that they were acquired or developed during the employment does not, by itself, give the employer a sufficient interest to support a restraining covenant, even though the on-the-job training has been extensive and costly." *Rem Metals Corp. v. Logan*, 278 Or. 715, 565 P.2d 1080, 1083 (1977) (concluding that employer had failed to show that employee's training and experience acquired through his employment as a welder of titanium castings was a protectible interest that would justify enforcement of a noncompete agreement) (quoting Harlan M. Blake, Employee Agreements Not to Compete, 73 Harv. L.Rev. 625, 652 (1960)).

Nonetheless, an employer has a protectible interest in "information pertaining especially to the employer's business." *Id.; see Cascade Exch., Inc. v. Reed*, 278 Or. 749, 565 P.2d 1095, 1096 (1977) (enforcing a noncompete agreement when "the employees' work necessarily involved access to plaintiff's customer lists, as well as some other specialized information relating to

customers, and employees ... had frequent and close contacts with plaintiff's customers on a personal basis") (internal quotation marks omitted); *North Pac. Lumber*, 551 P.2d at 434–35 (upholding a noncompete agreement where the employee had accumulated information about "the type of lumber which filled the special needs of the various buyers"); *Kelite Prods. v. Brandt*, 206 Or. 636, 294 P.2d 320, 322, 329 (1956) (affirming lower court's injunction restraining employees from soliciting or selling to customers of the former employer when the employees had access to customer lists that "showed the dates of purchases made by such customers ... and the types of products purchased").

Nike has shown that McCarthy acquired information pertaining especially to Nike's business during the course of his employment with Nike. As Brand Jordan's director of sales, McCarthy obtained knowledge of Nike's product launch dates, product allocation strategies, new product development, product orders six months in advance and strategic sales plans up to three years in the future. This information was not general knowledge in the industry. For instance, McCarthy was privy to information about launch dates— the date Nike plans to introduce a product in the marketplace—for Brand Jordan shoes up through the spring of 2004. According to the undisputed testimony of one of Nike's executives, if a company knew its competitor's launch dates, it could time the launch dates of its own products to disrupt the sales of its competitor.

---

**8.** McCarthy does not contest the geographic or temporal scope of the noncompete agreement, nor does he claim that it lacked consideration. McCarthy does argue that the district court erred in setting the duration of the preliminary injunction through August 26,

2004 based on the restriction period provided in the noncompete agreement. However, we decline to consider this argument because McCarthy failed to argue this below. *See Neal v. Shimoda*, 131 F.3d 818, 827 n. 11 (9th Cir.1997).

Nevertheless, McCarthy argues that acquisition of confidential information alone is insufficient to justify enforcement of a noncompete agreement. He contends that Nike must show actual use or potential disclosure of confidential information before a noncompete agreement can be enforced. He attempts to distinguish *Cascade Exchange, North Pacific Lumber* and *Kelite* as cases in which the employees actually used the confidential information, for example, to solicit the former employer's customers on behalf of the new employer. *See Cascade,* 565 P.2d at 1097; *North Pac. Lumber,* 551 P.2d at 434; *Kelite,* 294 P.2d at 322–23. These cases do not suggest that actual use is required for a noncompete clause to be enforceable, however. For example, in *North Pacific Lumber,* the court stated:

> It is clear that if the nature of the employment is such as will bring the employee [i]n personal contact with the patrons or customers of the employer, or enable him to acquire valuable information as to the nature and character of the business and [t]he names and requirements of the patrons or customers, *enabling him ... to take advantage of such knowledge* of [o]r acquaintance with the patrons or customers of his former employer, and thereby gain an unfair advantage, equity will interfere in behalf of the employer and restrain the breach of a negative covenant not to engage in such competing business ....

551 P.2d at 434 (quoting *Kelite,* 294 P.2d at 329) (emphasis added). Thus, the court recognized that an employee's mere ability to take advantage of the employer's confidential information and thereby gain an unfair advantage may be sufficient for equity to restrain the employee from engaging in a competing business. *See id.; see also Farmers Ins. Exch. v. Fraley,* 80 Or.App. 117, 720 P.2d 770, 771 (1986) (concluding that plaintiffs had a protectible interest where the employees "had *access* to confidential information which *could be used* to plaintiffs' detriment") (emphasis added).

■ An employee's knowledge of confidential information is sufficient to justify enforcement of the noncompete if there is a "substantial risk" that the employee will be able to divert all or part of the employer's business given his knowledge. *See Volt Servs. Group v. Adecco Employment Servs., Inc.,* 178 Or.App. 121, 35 P.3d 329, 334 (2001) (stating that customer contacts "can create a protectible interest when the nature of the contact is such that there is a substantial risk that the employee may be able to divert all or part of the customer's business"). Given the nature of the confidential information that McCarthy acquired at Nike and his new position with Reebok, there is a substantial risk that Reebok would be able to divert a significant part of Nike's business given McCarthy's knowledge. McCarthy had the highest access to confidential information concerning Nike's product allocation, product development and sales strategies. As vice president of U.S. footwear sales and merchandising for Reebok, McCarthy would be responsible for developing strategic sales plans, providing overall direction for product allocation and shaping product lines, including how products are priced. Thus, McCarthy could help choose product allocation, sales and pricing strategies for Reebok that could divert a substantial part of Nike's footwear sales to Reebok based on his knowledge of information confidential to Nike without explicitly disclosing this information to any of Reebok's employees. Accordingly, the potential use of confidential information by McCarthy in his new position with Reebok is sufficient to justify enforcing the noncompete agreement. We conclude that Nike has demonstrated

a likelihood of success as to the enforceability of its noncompete agreement with McCarthy.

## V. BALANCE OF HARDSHIPS

■ McCarthy contends that the district court erred in ruling that the balance of harm tipped in favor of Nike because the only harm that Nike would have suffered is "fair competition." Contrary to McCarthy's contention, Nike has shown potential harm from unfair competition due to McCarthy's knowledge of confidential information peculiar to Nike's products.

On the other side of the scale, a number of factors mitigate the potential harm to McCarthy from the preliminary injunction. First, Nike is obligated under the covenant not to compete to pay McCarthy his full salary during the restriction period. Second, Reebok has agreed to pay health and medical benefits for McCarthy and his family. Third, Reebok has agreed to keep the job offer to McCarthy open for a year. McCarthy, however, testified that the athletic footwear and apparel business is a fastmoving industry and that if he is forced to sit out for a year, he would have to do a lot of "catching up" after he returns to the industry. Nevertheless, the potential disruption to Nike's sales and products outweighs any harm that the injunction would cause McCarthy in the intermediate or long term. Thus, we conclude that the balance of harm tips in favor of Nike.

**AFFIRMED.**