DEHOOG, P. J.
*472 Plaintiff, Oregon Psychiatric Partners, LLP (OPP), appeals a judgment dismissing with prejudice OPP's complaint against defendant, Henry, a psychiatric nurse practitioner formerly employed by OPP. Plaintiff sought to enforce a noncompetition agreement that it had entered into with defendant; the trial court concluded that the agreement was unenforceable, granted defendant's motion for a directed verdict, and dismissed the complaint. On appeal, we conclude that, under ORS 653.295(4)(b), the agreement is at least in part enforceable as a "covenant not *401 to *** solicit or transact business with customers of the employer" and that the trial court therefore erred in dismissing the complaint.[1] Accordingly, we reverse and remand. *473 We state the facts in the light most favorable to plaintiff, the nonmoving party.[2] Plaintiff hired defendant in July 2013 to work as a psychiatric nurse practitioner at plaintiff's established clinic in Eugene. The parties signed an employment contract that included the following noncompetition agreement:
"LIMITED NON-COMPETITION. Nurse Practitioner shall not provide services, directly or indirectly through any person or entity, to any patients who have received services by Nurse Practitioner at OPP or any predecessor entity for a period of two (2) years after termination of Nurse Practitioner's employment under this agreement within fifty (50) miles of Eugene, Oregon. Pre-existing patients established with Nurse Practitioner in her private practice prior to the date of this contract shall be exempt from this restriction."
(Uppercase in original.) The contract also included a severability clause stating:
"The invalidity of any term or provision of this agreement shall not affect the validity of any other provision. If all or any portion of any provision of this agreement is held to be enforceable for any reason, the relevant provision or provisions shall be enforced to the extent permitted by law and so as to most fully accomplish the parties' objective intent."
In the fall of 2014, OPP's owner proposed modifying defendant's pay structure in a manner that would reduce her per patient income. Defendant rejected that proposal and told OPP that she would be quitting, effective February 2015. Defendant also told OPP that she considered the noncompetition agreement that she had entered to be unenforceable.
*474 In accordance with that belief, defendant opened her own practice in Eugene upon leaving OPP and continued to treat a number of the patients that she had first treated while working for OPP.
In response, OPP sued to enforce the noncompetition agreement, seeking injunctive relief and disgorgement of defendant's earnings *402 "from current or former patients of [OPP]." As noted, the case proceeded to a bench trial. In a pretrial motion, plaintiff moved to strike as insufficiently pleaded defendant's "affirmative defense" that the parties' agreement was unenforceable under ORS 653.295 ; the trial court denied that motion. Later, at the conclusion of plaintiff's case-in-chief, defendant moved for a "directed verdict," specifically relying on her defense that plaintiff had not shown that the parties' agreement met certain requirements of ORS 653.295(1), which, as set out above, states that a noncompetition agreement is "voidable and may not be enforced" unless it meets those requirements. Plaintiff contended that the parties' agreement satisfied the requirements of a valid noncompetition agreement under ORS 653.295(1), but also argued that those requirements were ultimately immaterial because the agreement fit within the statutory exclusion in ORS 653.295(4)(b), which provides that subsection (1) "do[es] not apply to *** [a] covenant not to solicit employees of the employer or solicit or transact business with customers of the employer."
The trial court granted defendant's motion, ruling that the agreement did not satisfy the requirements of ORS 653.295(1), because defendant had not been paid on a "salary basis." See ORS 653.295(1)(b) (requiring that the employee be "a person described in ORS 653.020(3)," which, in turn, requires that the employee earn a salary and be "paid on a salary basis"). When asked by plaintiff to specifically address "the exception to the statute for prohibitions on dealing with the employer's customers," the court reiterated its earlier conclusion that the agreement was a noncompetition agreement and said that it was "not excluded." The court subsequently entered a general judgment dismissing plaintiff's claims with prejudice; plaintiff appeals that judgment.
*475 On appeal, plaintiff assigns error to the trial court's denial of its motion to strike and the court's ruling granting defendant's motion for a directed verdict. We reject without written discussion plaintiff's argument that the trial court erred in failing to strike on pleading grounds defendant's "affirmative defense" that the parties' agreement was unenforceable under ORS 653.295, and we discuss only plaintiff's argument that the parties' agreement is enforceable under ORS 653.295(4)(b) as a "covenant not to *** solicit or transact business with customers of the employer," or "nonsolicitation agreement."[3] In support of that argument, plaintiff asserts that we should construe the phrase "customers of the employer" broadly, such that the agreement here fits squarely within the exclusion under ORS 653.295(4)(b). Alternatively, plaintiff argues that, at least as to the 34 patients that defendant "took" with her from OPP to her new practice, the agreement is potentially enforceable under the exclusion. Defendant disputes both points. She argues that, under ORS 653.295(4)(b), "customers of the employer" are limited to current customers and that, because the agreement does not distinguish between OPP's current and former patients, the requirements of ORS 653.295(1) apply. Defendant further argues, as a factual matter, that the patients at issue here cannot be viewed as "customers" within the meaning of ORS 653.295(4)(b). For the reasons that follow, we agree with plaintiff's alternative argument that the agreement is at least in part enforceable under ORS 653.295(4)(b), and we leave to further proceedings in the trial court the resolution of any factual issues that may remain.
As noted, ORS 653.295(4)(b) provides that the requirements and limitations of subsections (1) and (2) of the statute do not apply to "[a] covenant not to solicit employees of the employer or solicit or transact business with customers of the employer." And, as the parties' arguments reflect, the *476 application of that statute in this case turns on the meaning of the phrase "customers of the employer" and, specifically, on whether the *403 term "customers" encompasses the persons described in the noncompetition agreement: "any patients who have received services by [defendant] at OPP." To answer that question, we apply the framework set out in State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009), and examine the statute's text, context, and any pertinent legislative history in an effort to discern the legislature's intended meaning. Id.
Starting with the text of ORS 653.295(4)(b), we note that words of common usage "typically should be given their plain, natural, and ordinary meaning." PGE v. Bureau of Labor and Industries , 317 Or. 606, 611, 859 P.2d 1143 (1993) ; see Comcast Corp. v. Dept. of Rev. , 356 Or. 282, 296, 337 P.3d 768 (2014) (stating the "assumption that, if the legislature did not give the term a specialized definition, the dictionary definition reflects the meaning that the legislature would naturally have intended"). The word "customer" is defined as "one that purchases some commodity or service *** esp : one that purchases systematically or frequently," Webster's Third New Int'l Dictionary 559 (unabridged ed. 2002), and as a "buyer or purchaser of goods or services; esp., the frequent or occasional patron of a business establishment," Black's Law Dictionary 468 (10th ed. 2015). Those definitions support defendant's contention that the phrase "customers of the employer" refers to those people with an active or ongoing relationship with the employer and does not include former or merely incidental patrons.[4]
Statutory context also supports that understanding of "customers of the employer." We find guidance in common-law restrictions on noncompetition agreements, which were well established in 2007 when the legislature amended ORS 653.295 to add paragraph (4)(b). See Fresk v. Kraemer , 337 Or. 513, 520-21, 99 P.3d 282 (2004) ("Statutory context includes other provisions of the same statute and other related statutes, as well as the preexisting common law and the statutory framework within which the statute *477 was enacted."). Under the common law (and under ORS 653.295(1)(c) ), a noncompetition agreement is enforceable only when the employer has a valid protectable interest.[5] Volt Services Group v. Adecco Employment Services , 178 Or. App. 121, 126-27, 35 P.3d 329 (2001), rev. den. , 333 Or. 567, 42 P.3d 1246 (2002). In Volt Services Group , which predated the enactment of ORS 653.295(4)(b), we concluded that a temporary employment agency's relationship with its customers-corporations such as Nike who filled staffing needs through the agency-was sufficient to justify the enforcement of a noncompetition agreement against another employment agency. Id. We explained that customer contacts can create a protectable interest "when the nature of the contact is such that there is a substantial risk that the employee may be able to divert all or part of the customer's business." Id. As for nonsolicitation agreements specifically, the Oregon Supreme Court has explained that such agreements will often be enforceable against salespersons and agents, who "are generally hired and paid a salary in order that they may help build up custom, getting acquainted with customers and acquiring their good will." Kelite Prod., Inc. v. Brandt et al. , 206 Or. 636, 652, 294 P.2d 320 (1956) (internal quotation marks omitted).
That background suggests that the legislature enacted ORS 653.295(4)(b) to enable employers to protect no broader a scope of customer relationships than would have constituted protectable interests under the common law. Any broader interpretation of "customers" such as plaintiff urges would cause the exception in paragraph (4)(b) to swallow the general rule set forth in subsections (1) and (2), including paragraph (1)(c)'s requirement of a protectable interest. That is, if *404 paragraph (4)(b) provided an exception for agreements that prohibited soliciting or transacting business with parties with little or no ongoing relationship with the employer, then that exception would allow for agreements that inhibit *478 competition to much the same degree as blanket agreements not to compete. See ORS 653.295(7)(d) (defining "noncompetition agreement" as an agreement not to "compete with the employer in providing products, processes or services that are similar to the employer's products, processes or services"). It is unlikely that the legislature intended to permit the requirements of subsections (1) and (2) to be so easily circumvented, especially given that most of those requirements were enacted in the same bill that added paragraph (4)(b). See Or. Laws 2007, ch. 902, § 2.
The specific legislative history of ORS 653.295 (4)(b) further supports the understanding that the phrase "customers of the employer" requires a more substantial relationship than former or incidental patronage. As introduced, the bill that ultimately included the text codified at ORS 653.295(4)(b) did not provide an exception for nonsolicitation agreements; instead, the bill would have established another circumstance in which the enforcement of noncompetition agreements was prohibited, namely, where an employer had laid off the employee subject to the agreement.[6] Insurance agency advocates testified against the bill in its original form, but also suggested an amendment to the bill that would "carve[ ] out a type of agreement that deals with essentially antipirating, *** an agreement that restricts somebody from calling on clients and attempting to lure clients away within a certain period of time." Audio Recording, Senate Committee on Commerce, SB 616, Apr. 18, 2007, at 31:00 (statement of Jack Monroe, Independent Insurance Agents & Brokers of Oregon), https://olis.leg.state.or.us (accessed Aug. 16, 2018). As a result, the bill was amended to exempt nonsolicitation agreements, and, as the bill's carrier explained on the Senate floor, it now "clarifie[d] that agreements to protect customer lists are valid." Audio Recording, Senate Floor Debate, SB 248, May 11, 2007, at 46:40 (statement of Sen. Avel Gordly), https://olis.leg.state.or.us (accessed Aug. 16, 2018).
*479 The Senate passed the bill as amended. In the House, the bill was further amended to add the requirements now codified as ORS 653.295(1)(b), (c), and (d). At a public hearing on the House version, an employment attorney explained the need for the nonsolicitation exception, especially given that ORS 653.295(1)(b) only allowed standard noncompetition agreements to be enforced against "exempt employees," i.e. , salaried professionals. Audio Recording, House Committee on Judiciary, SB 248, May 24, 2007, at 1:40:00 (statement of Randall Sutton, Saalfeld Griggs PC), https://olis.leg.state.or.us (accessed Aug. 16, 2018). That witness explained that nonsolicitation agreements were appropriate for certain nonexempt employees, such as sales agents, who are employed to "develop relationships with customers," making the customer "more likely to follow that person to the next place." Id. at 1:41:30. The commissioner of the Bureau of Labor and Industries (BOLI) agreed that the bill "protected companies in saying that no employee can go and take a client list from an employer and go solicit those." Audio Recording, House Committee on Judiciary, SB 248, May 29, 2007, at 1:42:35 (statement of BOLI commissioner Dan Gardner), https://olis.leg.state.or.us (accessed Aug. 16, 2018). The commissioner gave an example prescient of the facts of this case:
"In other words, if I was a dentist and I was in partnership with someone else [and] the other party owns the business, I can't go take the client list from the company I work for and solicit those individual patients to try and build my own company should I want to open one up. So [the bill] also protects that as well, *** and I don't believe any employee should solicit the client list of a company they're working for."
*405 Id. at 1:42:50. Finally, in response to concerns that the bill placed too many restrictions upon the use of noncompetition agreements, the bill's carrier on the House floor explained that "soliciting customer lists *** [is] specifically carved out of the bill." Audio Recording, House Floor Debate, SB 248, June 22, 2007, Morning Session at 1:55:20 (statement of Rep. Greg Macpherson), https://olis.leg.state.or.us (accessed Aug. 16, 2018).
Thus, by permitting agreements that prohibit former employees from soliciting or transacting business with *480 "customers of the employer," the legislature appears to have intended for ORS 653.295(4)(b) to allow an employer to enforce an agreement not to solicit or transact business with persons or entities who would reasonably be expected to return to the employer for purposes of doing business when the employer-employee relationship ended. The legislature would likely have understood those "customers" to be the ones who would naturally appear on a business's "client list," which is the interest that the legislature intended to protect. That is not to say, as defendant suggests, that a person ceases to be a customer of the employer once the person voluntarily stops doing business with the employer in favor of the employee's new business.[7] Rather, the focus of ORS 653.295(4)(b) is on the status of the customers at the time that a former employee solicits or transacts business with them, not their status after the employee has successfully acquired their business. Thus, we conclude that, to the extent that the parties' nonsolicitation agreement merely prohibited defendant from serving patients who, at the time, would otherwise have tended to return to OPP for services, the agreement was not subject to the requirements of ORS 653.295(1), as the trial court held.[8]
We turn to the application of ORS 653.295(4)(b) in this case. Looking at the parties' agreement, which by its terms prohibits defendant from treating "any patients who *481 have received services by Nurse Practitioner at OPP," we agree with defendant that it is broader than the exception provided by ORS 653.295(4)(b). For example, the agreement would prevent defendant from doing business with a person whom she had treated only once on her first day at OPP, regardless of any relationship-or lack thereof-that the patient had with OPP. That person would not necessarily be a "customer[ ] of the employer" as we understand that phrase. Therefore, the agreement as written would restrict competition to a degree not permitted under ORS 653.295(4)(b).
That does not, however, render the parties' agreement void. As we understand plaintiff's argument, it contends that the trial court should have permitted its case to go forward at least to the extent that the parties' agreement was enforceable, even if it did not fully qualify under either ORS 653.295(1) or (4)(b). And there is authority for that position. Under longstanding Oregon law, "when an 'agreement is partly legal and partly illegal, if the legal may be separated from the illegal, the legal part will be enforced.' "
*406 Montara Owners Assn. v. La Noue Development, LLC , 357 Or. 333, 341, 353 P.3d 563 (2015) (quoting Eldridge v. Johnston , 195 Or. 379, 405, 245 P.2d 239 (1952) ). That is true even where "the legal and illegal parts of the provision are intermingled." Id. at 342, 353 P.3d 563. For example, in Montara Owners Assn. , a single indemnity provision required a subcontractor to indemnify the contractor to an extent prohibited under ORS 30.140.[9] Id. at 339, 353 P.3d 563. The Supreme Court concluded that the lawful portion of the indemnity provision was enforceable, reasoning that, in light of the common-law background permitting partial enforcement, the legislature had not intended for ORS 30.140"to create a different system where any imperfection in a contract provision would void the entire provision." Id. at 342, 353 P.3d 563.
The Supreme Court's decision in Eldridge , which it relied upon in Montara Owners Assn. , is instructive. In *482 Eldridge , a decision that predated the statutory provisions at issue here, a noncompetition agreement prevented the defendant from pursuing his trade for 10 years in "the entire states of Oregon and Washington." 195 Or. at 400, 245 P.2d 239. The court held that, "[e]ven assuming that the geographical limitation *** is unreasonable, yet the contract is severable, and out of that territorial limitation may be carved a reasonable area in which the covenant of defendant may and should be enforced." Id. at 409, 245 P.2d 239. Enforcement to that more limited degree was proper given the nature and purpose of the parties' agreement:
"The basic purpose of the contract justifies its severance as to territory *** in those places where defendant's acts are actually in competition with the business of plaintiffs. Defendant *** should not be permitted to escape his solemn obligation upon the mere technical theory that the territorial extent named in the contract was in general terms too broad when, without in any manner doing violence to the primary intent and purpose of the contract, but actually in strict compliance therewith, a reasonable territorial area may be severed therefrom."
Id. at 409-10, 245 P.2d 239 ; accord. Lavey/Moore/Brown v. Edwards , 264 Or. 331, 334, 505 P.2d 342 (1973) ; Kelite Prod., Inc. , 206 Or. at 655, 294 P.2d 320 ; Brinton Business Ventures, Inc. v. Searle , 248 F.Supp.3d 1029, 1038-39 (D. Or. 2017) (applying ORS 653.295(4)(b) to enforce nonsolicitation agreement, which reached both "customers or prospective customers," only as to "people who were customers of [employer] prior to the cessation of [employee's] employment").
Here, as in Montara Owners Assn. , nothing in ORS 653.295(4)(b) suggests that the legislature intended to preclude partial enforcement of overbroad nonsolicitation agreements. Moreover, through the severability clause of the parties' contract, defendant expressly agreed that its terms would remain enforceable "to the extent permitted by law and so as to most fully accomplish the parties' objective intent." Allowing plaintiff to enforce the agreement to the extent it can show that defendant engaged or sought to engage in business with its "customers" would accomplish that intent.
*483 We therefore consider whether plaintiff made a prima facie showing that defendant had violated the enforceable aspect of the parties' nonsolicitation agreement. At trial, plaintiff presented evidence that defendant, after leaving OPP, treated 34 patients whom she had first seen during the 20 months that she worked at OPP. The owner of OPP testified without objection that patients have reasons, such as convenience and familiarity, to continue seeking treatment at the same clinic even if a provider leaves. On appeal, defendant maintains that the 34 patients identified by OPP cannot be viewed as having been "customers" of OPP when she solicited or transacted business with them, because OPP had "voluntarily terminated its *407 relationship" with those patients.[10] Viewed in the light most favorable to plaintiff, however, plaintiff's evidence supports an inference that defendant's patients would reasonably have been expected to return to OPP for treatment at the time of defendant's departure and were therefore "customers of the employer" under ORS 653.295(4)(b).[11] As a result, the trial court erred in granting defendant's motion and dismissing plaintiff's claims. See 293 Or. App. at 473 n. 2, 429 P.3d at 401 n. 2 (explaining our standard of review).
Reversed and remanded.

ORS 653.295(4)(b) provides a statutory exception for certain agreements that might otherwise be subject to the requirements and limitations of ORS 653.295(1) and (2), the statute that the trial court relied on in dismissing plaintiff's complaint. In part, ORS 653.295 provides:
"(1) A noncompetition agreement entered into between an employer and employee is voidable and may not be enforced by a court of this state unless:
"(a)(A) The employer informs the employee in a written employment offer received by the employee at least two weeks before the first day of the employee's employment that a noncompetition agreement is required as a condition of employment; ***
"*****
"(b) The employee is a person described in ORS 653.020(3) [requiring, among other things, that the person '[e]arns a salary and is paid on a salary basis'];
"(c) The employer has a protectable interest ***[; and]
"(d) The total amount of the employee's annual gross salary and commissions, calculated on an annual basis, at the time of the employee's termination exceeds the median family income for a four-person family ***.
"(2) The term of a noncompetition agreement may not exceed 18 months from the date of the employee's termination. The remainder of a term of a noncompetition agreement in excess of 18 months is voidable and may not be enforced by a court of this state.
"*****
"(4) Subsections (1) and (2) of this section do not apply to:
"*****
"(b) A covenant not to solicit employees of the employer or solicit or transact business with customers of the employer."

The parties tried the case to the court without a jury. In a bench trial, a defendant's motion for directed verdict is better understood as an ORCP 54 B(2) motion for involuntary dismissal "on the ground that upon the facts and the law the plaintiff has shown no ground for relief." See Marlow v. City of Sisters , 281 Or. App. 462, 465, 383 P.3d 908 (2016). A court may grant a motion under ORCP 54 B(2) "on either of two grounds: (1) The plaintiff has failed to present a prima facie case (the 'directed verdict' standard); or (2) even if the plaintiff has presented a prima facie case, the court, as trier of fact, is unpersuaded by the plaintiff's evidence." Venture Properties, Inc. v. Parker , 223 Or. App. 321, 336, 195 P.3d 470 (2008) (emphases in original). Here, the court applied the "directed verdict" standard, stating that it was "required to look at the evidence in the light most favorable to the non-moving party."

Because we ultimately conclude that the trial court erred in dismissing plaintiff's complaint (because the agreement was, in fact, at least in part enforceable as a nonsolicitation agreement under ORS 653.295(4)(b) ), we need not decide whether the trial court erred in dismissing the complaint based on its determination that a requirement of ORS 653.295(1)(b) -that the employee have been paid on a salary basis-had not been met. Accordingly, we do not address that aspect of plaintiff's appeal.

The word "customer" is derived from "custom," in the sense of "habitual patronage of an establishment." Webster's at 559.

Protectable interests under ORS 653.295(1)(c) include "trade secrets, as that term is defined in ORS 646.461"; "competitively sensitive confidential business or professional information that otherwise would not qualify as a trade secret, including product development plans, product launch plans, marketing strategy or sales plans"; and interests specific to media broadcasters. Defendant does not dispute that plaintiff has a valid protectable interest within the meaning of ORS 653.295(1).

There were initially two similar bills amending ORS 653.295, both of which were referred to the Senate Committee on Commerce. SB 248 (2007); SB 616 (2007). The committee held a single public hearing on SB 616 before proceeding with SB 248, and it is apparent that the hearing influenced the committee's consideration of SB 248.

That argument might be plausible if ORS 653.295(4)(b) were restricted to agreements not to solicit customers of the employer. But an agreement not to "transact business with customers of the employer" would be meaningless if a person ceased to be a customer of the employer at the moment that they chose to instead patronize the employee's new business, and defendant does not dispute that she "transact[ed] business" with her former patients. We recognize that a prohibition on transacting business with customers-as opposed to soliciting that business-may well be something that many experienced business attorneys would have placed in a traditional noncompetition , rather than nonsolicitation, agreement. As a result, that prohibition would be subject to, among other limitations, the requirement that it "not exceed 18 months from the date of the employee's termination," ORS 653.295(2), a limit that does not apply under ORS 653.295(4)(b). Given that a prohibition on transacting business with former customers could be viewed as exceeding the legislative concerns that warranted an exception for nonsolicitation agreements, the legislature may at some point wish to reconsider how far that exception should extend. We, however, construe only the text that the legislature has given us.

To the extent defendant argues that the notice OPP gave her patients when she announced her departure changed the status of those patients, that would not affect the validity of the parties' agreement, even if it might affect its application. See 293 Or. App. at 483, 429 P.3d at 406-07.

ORS 30.140(1) provides that, "[e]xcept to the extent provided under subsection (2) of this section," a provision in a construction contract is void if it requires the indemnitor to indemnify another against damage "caused in whole or in part by the negligence of the indemnitee." The exception in ORS 30.140(2) provides that "[t]his section does not affect any provision in a construction agreement *** to the extent that" the damage "arises out of the fault of the indemnitor" or its agents.

When defendant left OPP, OPP notified defendant's patients that it had "the capacity to continue providing care to some, but not all, of [her] current patients" and that they should contact OPP if they "would like to continue [their] care" at OPP. An OPP employee later referred patients to defendant, although OPP's owner testified that the employee was not authorized to do so. Defendant argued to the trial court that those facts constituted a waiver of plaintiff's right to enforce the noncompetition agreement, but she does not reprise that argument on appeal.

Because the trial court dismissed plaintiff's case before defendant put on her own case, it remains to be seen whether defendant will introduce evidence that any of those patients had ceased to be customers of OPP before defendant left or that their patronage had been merely incidental. At that time, the finder of fact can address the significance, if any, of OPP's notice to the patients defendant had treated while at OPP.