Argued and submitted December 4, 2020, affirmed July 21, 2021

PETERSON MACHINERY CO.,
*Plaintiff-Appellant,*

*v.*

Bryan R. MAY,
an individual; and
Modern Machinery, a corporation,
*Defendants-Respondents.*

Lane County Circuit Court
18CV03151; A170692

496 P3d 672

The trial court granted defendants' motion for summary judgment as to plaintiff's claim for misappropriation of trade secrets, ORS 646.461 to 646.475. On appeal, plaintiff assigns error to that ruling. Plaintiff argues that its "evidence allowed a jury to find its business information is a trade secret, as defined by ORS 646.461(4)." Plaintiff also argues that it "presented sufficient evidence to create a factual issue to permit a reasonable factfinder to find that defendants misappropriated its confidential customer information within the meaning of ORS 646.461(2)(d)(C)." *Held*: The Court of Appeals concluded that the trial court did not err in granting summary judgment to defendants on plaintiff's claim for misappropriation of trade secrets. Plaintiff did not meet its burden to adduce evidence from which a reasonable finder of fact could determine that defendants misappropriated trade secrets under ORS 646.461.

Affirmed.

Charles D. Carlson, Judge.

Andrew M. Schpak argued the cause for appellant. Also on the briefs were Iris K. Tilley, Josh M. Goldberg, and Barran Liebman LLP.

Andrea D. Coit argued the cause for respondents. Also on the brief were Jonathan M. Hood, Laura T.Z. Montgomery, and Hutchinson Cox.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

TOOKEY, J.

Affirmed.

**TOOKEY, J.**

Plaintiff, Peterson Machinery Co. (Peterson), brought claims against defendants, Brian May and Modern Machinery (Modern), including a claim for misappropriation of trade secrets, ORS 646.461 to 646.475. May was an employee of Peterson, who left Peterson to work for Modern, a competitor of Peterson. Both Peterson and Modern service, rent, and sell heavy machinery in Oregon; May rented and sold heavy machinery for both.

We write to address only Peterson's first assignment of error, in which Peterson assigns error to the trial court's decision to grant May and Modern's motion for summary judgment dismissing Peterson's claim for misappropriation of trade secrets. We affirm the trial court's grant of summary judgment with respect to that claim. We reject without discussion Peterson's second through tenth assignments of error. Accordingly, we affirm.

## I.   STANDARD OF REVIEW

"We review the trial court's grant of summary judgment to determine whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law." *Morris v. Dental Care Today, P.C.*, 306 Or App 259, 261, 473 P3d 1137 (2020), *rev den*, 367 Or 668 (2021) (citing ORCP 47 C). "That standard is satisfied when, viewing the evidence in the record and all reasonable inferences that may be drawn from it in favor of the nonmoving party, no reasonable factfinder could return a verdict for the nonmoving party." *Id.* (internal quotation marks omitted). "In response to a motion for summary judgment, the nonmoving party bears the burden to produce evidence on any issue raised in the motion as to which the nonmoving party would have the burden of persuasion at trial." *Id.* (internal quotation marks omitted). To survive a motion for summary judgment, the party with the burden of proving a claim must present evidence that gives the factfinder a basis "other than sheer speculation" to conclude that the elements of the claim have been met. *Brant v. Tri-Met*, 230 Or App 97, 104, 213 P3d 869 (2009).

We state the facts in accordance with our standard of review.

## II.   FACTS

A.  *Peterson, Modern, and the Heavy Machinery Market in Oregon*

Peterson is an Oregon company that engages in the business of renting, selling, and servicing Caterpillar brand heavy machinery in Oregon, Washington, and California. Defendant Modern is a Montana company doing business in Oregon and is engaged in the business of renting, selling, and servicing primarily Komatsu brand heavy machinery.

Heavy machinery sales is a "niche" market in Oregon, and there are only "a handful" of companies in Oregon that sell heavy machinery. Peterson has consistently held the majority of the market share for heavy machinery sales in Oregon, while Modern has maintained an average of less than 10% of the market share during the times relevant to this litigation. Modern's market share declined after it hired May. Nevertheless, Modern is one of Peterson's "biggest competitors" in the Willamette Valley.

Heavy machinery dealers in Oregon know who the heavy machinery customers are in Oregon. During discovery in this case, the parties identified over 300 businesses that were either current customers or prospective customers of both Modern and Peterson at the time May left Peterson and began working for Modern.

Heavy machinery can cost hundreds of thousands of dollars or for the very large machines, millions of dollars. The sales process for heavy machinery involves negotiation, and customers of Modern regularly share with Modern the prices and other beneficial terms that have been quoted by Modern's competitors.

B.  *May's Employment with Peterson*

May began working for Peterson in 2006 as a rental coordinator. In 2010, May was promoted to the position of rental consultant. May's primary duty as a rental consultant was to perform outside sales and rental work in his designated territory. He spent 90 percent of his time in the field. His duties included making "10 to 15 sales calls per day, including office and jobsite visits," reviewing rental

agreements, harvesting lead information, and keeping customer profiles up to date, and "achieving business plan results."

As a rental consultant, May worked directly with customers and prospects to promote Peterson's offerings and make presentations and recommendations about the kinds of equipment and accessory options that would best suit their needs, which in turn, required him to understand the type of work for which customers needed equipment and the conditions of particular job sites.

May developed close, long-term relationships with many Peterson customers.

C.  *Peterson's Customer Relations Management System, SalesLink*

In order to perform his job, Peterson provided May access to customer information and market research compiled in Peterson's customer relations database, SalesLink. SalesLink contains detailed information about Peterson customers and potential customers, including but not limited to contact information, sales analyses, fleet information and preferences, and sales and rental history. The information in SalesLink takes significant time, expense, and effort to collect, and allowed Peterson to fine tune its analysis of opportunities, prospects, marketing opportunities, campaigns and surveys. All employees of Peterson have access to SalesLink, but not all customer information in SalesLink is accessible to all employees of Peterson.

Peterson utilizes three levels of progressively restrictive access to SalesLink based on employee roles and responsibilities. The first level, "Customer Search," allows users to access customer information including contact information, work order history, equipment lists, and sales call activity. This is the level of access May had when he first started at Peterson as a rental coordinator.

The second level of access, "SalesLink Sales Reps," allows a user to access all of the information available at level one and, in addition, information related to "customer sales and rental history, dollars spent"—*i.e.*, a comprehensive

sales analysis for the customer, the customer's five-year expenditures, quotes, and accounts receivable information. May gained access to level two when he was promoted to rental consultant.

The third level of access, "SalesLink Executive," provides full view of all customer information and other company information. Level three access is limited to supervisors, managers, and "anybody above."

D.   *May's Notebooks and His Responsibility for Entering Information in SalesLink*

After May was promoted to rental consultant, he was required to input information into SalesLink on a daily basis about his interactions in the field with customers and potential customers. May carried a notebook with him to take notes about his day and pertinent information relating to his observations and discussions with customers and prospective customers. May used the notebook as a reference when entering information into SalesLink. After a notebook was full, May either threw the notebook away or put it in a cabinet in the Peterson rental store. May threw away the final notebook he had been using at Peterson.

E.   *May's Performance at Peterson*

In July 2017, May was placed on a Performance Improvement Plan (PIP) by his then-supervisor because his performance over the prior six months was unsatisfactory. The PIP set forth minimum objectives that May was required to meet, and, if he failed to meet those objectives, his employment would be terminated.

Under the PIP, May was required to create a "weekly plan" with the names of approximately 50 prospective or current customers that he intended to target that week with sales calls. On Mondays, May was required to email the list to his supervisor to alert him of May's schedule for the week. May took a hard copy of the list with him during the week and made brief notes about what happened when he called on each business. He used that notated list to discuss his weekly activities with his supervisor during check-in meetings at the end of the week. At those meetings,

May's supervisor gave May a hard copy of his PIP and the weekly plan from the previous week.

After this litigation commenced, May obtained legal representation and searched for documents to bring to his attorney. He found a copy of his PIP for the week of October 13, 2017, in his truck. His supervisor had given May a copy of that PIP at the weekly check-in meeting. The fifth page of that PIP is the weekly plan May created for the week of October 2, 2017. It contains the names of 43 customers, with handwritten notations next to 24 of them. Some of those notations read simply "left card" or "left message," others note that May quoted prices for particular equipment (though the dollar value of such quotes are unspecified in the PIP), others address Peterson's relationship with the customer (*e.g.*, "[J] loves us," "[B] uses us when he can"), and a few note customer's potential needs in the future (*e.g.*, "[M] may want to buy T14 trailer"). May had no other copies of his PIP, and he did not show it to or give a copy to Modern.

Although May was put on a PIP, Peterson considered May to be "a very valuable employee for Peterson and for Modern Machinery," who had "years of training *** and preparation," including sales training. He was the type of employee who was "very hard to find" in the heavy machinery industry.

F.   *Modern Hires May*

In the summer 2017, Modern began asking its customers for referrals for an outside sales position that they anticipated needing to fill in Oregon at the beginning of 2018. May was mentioned by more than one of Modern's customers as a good option for Modern to pursue. May met with Modern to discuss the possibility of employment, and, in October 2017, Modern decided to offer May a position as territory manager at its Eugene, Oregon, location. May accepted that job offer.

G.   *May Departs from His Employment with Peterson*

On Sunday, October 29, 2017, May sent an email from his Peterson email account to his personal email account, blind copying 139 customers with whom May had worked during his time at Peterson. That email stated:

"I wanted to say THANK YOU for everything these past 7+ years while I was your Rental Consultant. Effective immediately, I am no longer with Peterson CAT and have decided to move on to a new chapter. I will still be in the equipment industry and hope we will cross paths again! If you would like to reach out to me via text or call, my cell number is: *** or email me at: ***."

Using the blind copy function ensured that each recipient of the blind copy would only see the email addresses of the sender (*i.e.*, May's Peterson email) and the recipient (*i.e.*, May's personal email), and not the other blind copies. Additionally, May's personal email received a copy of the email with the email addresses of only the sender and primary recipient (not the blind-copy recipients).

May then emailed his supervisor and informed him that he was resigning. May turned in his Peterson laptop, smartphone, and keys.

In his final month at Peterson—October 2017—May accessed SalesLink 12 times, which was approximately the average number of logins for the months of January 2015 to October 2017.[1] However, in an affidavit submitted in response to May and Modern's motion for summary judgment, a Peterson affiant averred that, "in the last week of his employment" with Peterson, "May spent a considerable amount of time after work hours searching for and reviewing a variety of customer and prospective customer lists as well as other trade secret information in SalesLink," which "served no apparent work purpose."

H.   *May's Employment with Modern*

May started working for Modern as a territory manager in early November 2017. As a territory manager at Modern, May's primary duty is to call on prospective purchasers of heavy machinery in his assigned territory and to try to negotiate sales of Komatsu brand heavy machinery and other brands Modern represents.

While at Modern, May's previous working relationships have "entered into [his] thought process" in deciding

---

[1] The average number of logins each month from January 2015 to October 2017 was 10.6 per month.

"who to call on or visit" insofar as the "familiarity of being able to walk in there and say hi to a familiar face." May testified, however, that he does not recall pursuing any specific leads because of a familiarity with a particular customer from his previous employment with Peterson.

Since May joined Modern, Modern's Eugene store has opened 12 new accounts with customers who were also Peterson customers. Additionally, as of December 2018, May generated approximately $7,500,000 in sales and rentals at Modern for customers who were also Peterson customers. In terms of total sales while at Modern, May is ranked around the top third of the salespeople and is a successful salesperson.

While working for Modern, May has made notations in Modern's customer relations management system, three of which we understand Peterson to point to on appeal in advancing its arguments.[2] All three entries concern individuals with whom May had direct contact in the course of his sales work for Modern; two of whom May delivered "literature, [a] brochure, or [a] card" to. One entry reads:

> "Worked with [D] in rentals while at Peterson. They typically need light tower, compressors and plate compactors. Occasionally need mini excavators and will call me. No sale opportunity at this time."

A second reads:

> "I have known [W] from previous employer in rentals. He has a CAT excavator and skidsteer both are still in good shape. He typically only rents attachments for his skidsteer. No sale opportunity at this time."

The third notes that the customer had "rented a ton of equipment from me in the past."

I.  *The Instant Litigation*

On November 30, 2017, Peterson sent May a letter demanding that May "immediately cease and desist [his]

---

[2] From Peterson's briefing, it is unclear which particular entries in Modern's customer relations management system Peterson points to on appeal, but we understand the entries to which Peterson points to be the three described in this opinion.

work for Modern Machinery and within 24-hours provide to [Peterson] written confirmation" that May had quit his employment with Modern. May did not respond to the letter.

In January 2018, Peterson filed a complaint against May alleging, among other causes of action, a claim for misappropriation of trade secrets, and subsequently amended its complaint to include a claim for misappropriation of trade secrets against Modern as well.

May and Modern then moved for summary judgment, arguing that Peterson had failed to identify any "trade secrets" and that there is no evidence of "misappropriation" by Modern or May. Peterson's response to May and Modern's motion focused heavily on the information to which May had access in Peterson's SalesLink database. Peterson also argued, among other points, that Peterson's customer list and customer contact information are trade secrets; that May retained a "list of 50 hand-selected customers" after leaving Peterson (*i.e.*, contained in his PIP); that May took and destroyed a notebook with information that should have been entered into SalesLink; and that May sent an email to 139 Peterson customers using the autofill feature from Peterson's address book, which constituted misappropriation of a trade secret. It also noted that, during discovery, May was able to "reconstruct a partial list of Peterson's customers from memory."

The trial court granted defendants' motion for summary judgment and dismissed Peterson's misappropriation claim with prejudice.

### III.   ANALYSIS

As noted above, Peterson assigns error to the trial court's decision to grant May and Modern's motion for summary judgment on Peterson's claim for misappropriation of trade secrets.

Oregon's Uniform Trade Secrets Act (UTSA) provides that a "complainant is entitled to recover damages adequate to compensate for misappropriation," and also provides for injunctive relief. ORS 646.465; ORS 646.463. As relevant here, "misappropriation" is defined in the UTSA to mean:

"(d)    Disclosure or use of a trade secret of another without express or implied consent by a person, who at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was:

"* * * * *

"(C)    Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use."

ORS 646.461(2).[3]

        "Trade secret" is defined in the UTSA to mean:

"information, including a drawing, cost data, customer list, formula, pattern, compilation, program, device, method, technique or process that:

"(a)    Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

"(b)    Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

ORS 646.461(4).

---

[3] ORS 646.461(2) provides, in full:

"'Misappropriation' means:

"(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

"(b) Disclosure or use of a trade secret of another without express or implied consent by a person who used improper means to acquire knowledge of the trade secret;

"(c) Disclosure or use of a trade secret of another without express or implied consent by a person who, before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake; or

"(d) Disclosure or use of a trade secret of another without express or implied consent by a person, who at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was:

"(A) Derived from or through a person who had utilized improper means to acquire it;

"(B) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

"(C) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use."

On appeal, Peterson argues that it "presented sufficient evidence to create a factual issue to permit a reasonable factfinder to find that defendants misappropriated its confidential customer information within the meaning of ORS 646.461(2)(d)(C)."

In *Kaib's Roving R.PH. Agency, Inc. v. Smith*, 237 Or App 96, 103, 239 P3d 247 (2010) (*Kaib's*), we elaborated on the meaning of "trade secret" and on the sort of evidence required to give rise to a factual dispute as to whether something is or is not a trade secret:

> "To constitute a trade secret under ORS 646.461(4), information (including compilations) must both (1) gain value because it is not generally known and (2) be the subject of reasonable efforts to maintain that secrecy. Each of those determinations is made, not by reference to legal principles, but on the basis of the historical facts and circumstances presented: Is the information at issue generally known within the relevant community? Is it more valuable by virtue of not being generally known? What efforts were made to keep it secret? Were those efforts reasonable? *Et cetera.* The definition set forth in the statute itself therefore necessarily implies that whether information is or is not a trade secret is a question of fact. If facts and circumstances are presented to establish that the information derives economic value from not being generally known and is subject to reasonable efforts to maintain its secrecy, then the information is a trade secret within the meaning of the statute."

*Id.*

In *Kaib's*, the trial court granted the defendants' motion for summary judgment on the basis that the allegedly misappropriated information did not constitute trade secrets, and, on appeal, we reversed and remanded. *Id.* at 104-05. The information at issue in *Kaib's* was allegedly misappropriated from the plaintiff, who was in the business of providing "relief pharmacists for pharmacies in need of temporary assistance," and it concerned customer needs and policies. *Id.* at 98-100.[4] Affidavits opposing summary judgment provided evidence that "some of the information misappropriated was compiled and developed over a period

---

[4] Specifically, the alleged trade secrets in *Kaib's* consisted of the following:

"(1) How the pharmacists can maintain independent contractor status. * * *.

"(2) The process by which customers refer openings to [plaintiff] and the process [plaintiff] uses to inform my relief pharmacists about available positions.

"(3) The process by which [the] pharmacists receive priority for positions.

of 20 years"; that "it would take an average business person at least one year to develop similar data"; that the information at issue "was specialized, confidential, and compiled as the result of much expense and many years' labor"; that the information "was not generally known"; and that the information had "independent economic value." *Id.* at 104. We concluded that the evidence "establishe[d] genuine issues of fact regarding whether the items of information at issue constitute[d] trade secrets." *Id.*

More recently, we considered what constitutes a "trade secret" under ORS 646.461(4) in *Pelican Bay v. Western Timber*, 297 Or App 417, 443 P3d 651, *rev den*, 365 Or 721 (2019). In that case, the defendant, after a 14-year career as a lumber sales trader for the plaintiff, Pelican Bay Forest Products, gave his son-in-law, Hotmer, a portion of his Pelican Bay customer list, along with other information about those customers and their business with Pelican Bay. *Id.* at 419. Hotmer, with the defendant's assistance, "parlayed that information into a timber sales job with one of Pelican Bay's competitors," Western Timber. *Id.* Western Timber "hired Hotmer because of Hotmer's access to the

---

"(4)   The process by which [plaintiff] confirm[s] with customers that a particular relief pharmacist will be at their store at a date and time certain and the length of the shift.

"(5)   The customs and practices of each store in a chain and of each independent pharmacy, including the manager's specific requirements.

"(6)   Whether a store has technician assistance coverage or not.

"(7)   Whether the store has employees with allergies.

"(8)   The amount of internet prescriptions and the volume of walk-in business.

"(9)   Whether lunch time is paid for or not.

"(10) The amount of narcotic paperwork, which is highly complex and difficult for some pharmacists to prepare.

"(11) The store policy for paying for lodging for the relief pharmacists.

"(12) Whether and how much drive time is paid for.

"(13) The amount of customers' paperwork.

"(14) The billing rates paid by chains versus independent stores.

"(15) The store's billing cycles.

"(16) The profitability of the relief pharmacy business and prospects for the future.

"(17) The agreement between the pharmacy and [plaintiff]."

*Kaib's*, 237 Or App at 99-100 (brackets in *Kaib's*).

customer information supplied by" the defendant, and Western Timber would not have hired Hotmer "without [his] possession of the customer information that [the defendant] supplied him." *Id.* at 421.

The customer information given to Hotmer by the defendant consisted of "customer and lumber mill information from plaintiff's customer list, 'customer profiles,' customer purchasing preferences, shipping preferences, payment habits, information regarding Pelican Bay's outstanding orders, and Pelican Bay's pricing." *Id.* The defendant had also "agreed to train Hotmer on how to use the customer information to efficiently sell to plaintiff's customers." *Id.* In his job with Western Timber, Hotmer used defendant's "customer information to make sales on behalf of Western Timber." *Id.* at 419.

The trial court granted the defendant's motion for summary judgment and, on appeal, we reversed and remanded. We explained that

> "[t]he evidence would also permit finding that the information is of the nature that derives economic value from being kept secret. Defendants admitted that the lumber sales business is competitive and that it takes many years to build up a quality book of business. Because of that fact, when Hotmer started working for Western Timber, it had Hotmer sign an agreement that said that the business he was bringing over from Pelican Bay, as well as any new business he acquired, was the property of Western Timber, and that Hotmer did not have authority to sell or transfer the customer information. The fact that Western Timber would not have hired Hotmer but for his access to [the defendant's] customer information from Pelican Bay also allows for the inference that that information is something that derives economic value from the fact that it is not generally available information."

*Id.* at 429.

Our discussion of trade secrets in *Pelican Bay* and *Kaib's* reflects that certain customer information can be a trade secret. It also reflects that information that is generally known in an industry is not a trade secret. That understanding is consistent with the legislative history of Oregon's UTSA. *See* Exhibit G, Senate Committee on Judiciary, SB

298, Apr 1, 1987 (National Conference of Commissioners on Uniform State Laws, *Uniform Trade Secrets Act with 1985 Amendments* (1985)) ("If the principal persons who can obtain economic benefit from information are aware of it, there is no trade secret. A method of casting metal, for example, may be unknown to the general public but readily known within the foundry industry."); Exhibit G, Senate Committee on Judiciary, SB 298, Apr 1, 1987 (Ramon A. Klitzkue, *The Uniform Trade Secrets Act*, 64 Marq L Rev 277, 289 (1980)) ("In other words, the value of the information must arise from its not being generally known to, or readily ascertainable by, others who can derive economic gain from such knowledge. Thus, information generally known in an industry cannot be a trade secret.").

With that background in mind, we turn to the alleged "trade secrets" at issue in this case. On appeal, Peterson's arguments can be grouped into three types of information allegedly misappropriated by May: (1) the information in May's PIP document, (2) May's departure email to Peterson customers, and (3) the information in May's notebook (which May discarded) and in May's memory.[5] We consider each in turn.

A.   *The Information in May's PIP*

With regard to May's PIP document, Peterson contends that that document "contain[ed] valuable, confidential, and proprietary information about customers' present and prospective needs, such as notes about specific customer plans to purchase specific types of equipment" that were "created using the information [May] was able to obtain from subscriptions that Peterson had purchased, confidential information in Peterson's customer database SalesLink, and nonpublic records relating to Peterson's prior interactions with its customers."

In this case, viewing the evidence in the record and all reasonable inferences that may be drawn from it in

---

[5] We note that in *Pelican Bay* we rejected an argument by the defendants that the information taken from the plaintiff was not a "trade secret for purposes of the Uniform Trade Secrets Act simply because he used his memory to take it." 297 Or App at 431. We stated that "the terms of the act are written broadly so as to safeguard trade secrets, no matter the form in which they may be misappropriated." *Id.*

favor of Peterson, we conclude that no reasonable factfinder could determine that May or Modern misappropriated trade secrets contained in May's PIP document.

To start, we observe that, although the PIP document listed the names of 43 customers or potential customers of Peterson, the evidence adduced at summary judgment reflects heavy machinery dealers in Oregon, such as Peterson and Modern, know who the heavy machinery customers are in Oregon. *See Kaib's*, 237 Or App at 103 (noting that, in determining whether something is a trade secret, consideration must be given to whether "the information at issue [is] generally known within the relevant community"). Indeed, at the time May left Peterson, there were over 300 crossover customers or prospective customers between Modern and Peterson. *See Restatement (Third) of Unfair Competition* § 42 comment f (1995) ("[S]olicitation of the same customers by a number of competitors is evidence that the customer identities are generally known or readily ascertainable in the trade.").[6] Given those uncontroverted facts, we do not think that Peterson met its burden to adduce evidence from which a reasonable finder of fact could determine that the mere identities of Peterson customers were trade secrets under ORS 646.461. That is, they did not adduce evidence from which a reasonable finder of fact could determine that the identity of Peterson customers "derive[d] 'independent economic value, actual or potential, from not being generally known to the public or *to other persons who can obtain economic value from its disclosure or use*.'" ORS 646.461(4)(a) (emphasis added).[7]

---

[6] The *Restatement* provides that the "principles of trade secret law" described in the *Restatement* "are applicable to actions under the Uniform Trade Secrets Act as well as to actions at common law," except "as otherwise noted." *Restatement* § 39 comment b.

[7] We note that the issue in this case is not whether, given this record, a reasonable finder of fact could determine that a complete list of Peterson customers and prospective customers was a "trade secret." This case involves the identities of a subset of Peterson customers and prospective customers.

We also note that there is evidence in the record from which a reasonable finder of fact could determine that Peterson considered the identities of its customers and prospective customers to be a "trade secret," *e.g.*, Peterson's employee handbook identified customer lists as a "confidential business information." But whether a party *considers* certain information to be a "trade secret" is a different issue than whether that information is a trade secret as defined in ORS 646.461(4).

May's PIP document also contained handwritten notations beyond the business names of Peterson customers or potential customers—*e.g.*, a few notes where May had noted that he quoted a price to a particular customer for a particular piece of equipment (though the price is not specified in the PIP document) or noted a customer's potential need in the future for a particular piece of equipment. Even assuming such limited notations could constitute trade secrets—an issue on which we express no opinion—Peterson failed to adduce evidence to establish a genuine issue of material fact as to whether those trade secrets had been "misappropriated"—*i.e.*, used or disclosed—by May or Modern. Peterson has made no attempt to link any of the scant information about a few particular customers or potential customers on May's PIP form to any of May's activities while he was working at Modern, and in light of the summary judgment record in this case, such linkage would be unduly speculative. *See West v. Allied Signal, Inc.*, 200 Or App 182, 192 n 4, 113 P3d 983 (2005) ("The line between a reasonable inference that may permissibly be drawn by a jury from basic facts in evidence and an impermissible speculation is not drawn by judicial idiosyncrasies. The line is drawn by the laws of logic." (Internal quotation marks omitted.)).

B. *May's Departure Email*

With regard to May's departure email, Peterson contends that it presented admissible evidence that raised "a genuine issue of material fact that May used Peterson's equipment and confidential information to solicit 139 of Peterson's largest customers for his new employer," which should have precluded summary judgment, and that "[a]n objectively reasonable juror could find that May's use of Peterson's customer information without its consent constitutes misappropriation."

---

In some cases, "the fact that an employee has appropriated a written list or has made an attempt to memorize customer information prior to terminating the employment may justify an inference that the information is valuable and not readily ascertainable by proper means." *Restatement* § 42 comment f. In this case, however, on this record, we believe an inference that the mere identity of some of Peterson customers was a trade secret would be unduly speculative. In that regard, we note that both Peterson and Modern utilized UCC filings and subscription services—*e.g.*, Dodge Pipeline and Contractor's Plan Center—to identify some prospective customers.

As noted above, given the summary judgment record in this case, we do not think a reasonable juror could find that the identities of Peterson customers were a trade secret under ORS 646.461(4). It is undisputed, however, that in sending emails to 139 Peterson customers, May used the email addresses of those 139 customers from Peterson's email system. That brings into question whether Peterson met its burden of establishing a genuine issue of material fact as to whether those 139 email addresses were "trade secrets" that were misappropriated under ORS 646.461(4).

We conclude that Peterson did not meet its burden. Peterson did not adduce evidence reflecting, for example, that the email addresses were not publicly known (or how many were not publicly known), how long it would take someone to compile such email addresses, or what the economic value of those email addresses was as compiled by Peterson. *Cf. Kaib's*, 237 Or App at 104 (genuine issue of material fact as to whether information constituted trade secrets where affidavits reflected that "it would take an average business person at least one year to develop similar data," that the information at issue "was specialized, confidential, and compiled as the result of much expense and many years' labor," that the information "was not generally known," and that it had "independent economic value"); *Pelican Bay*, 297 Or App at 429 ("The fact that Western Timber would not have hired Hotmer but for his access to [the defendant's] customer information from Pelican Bay also allows for the inference that that information is something that derives economic value from the fact that it is not generally available information.").

To be sure, there is evidence in the record that *SalesLink* contained, among other information, a comprehensive sales analysis for customers, information about customers' five-year expenditures, quotes given to customers, and accounts receivable information; but it does not follow from that that the email addresses of Peterson customers were trade secrets.

C.  *May's Notebook and Information May Committed to Memory*

We turn next to May's notebook and information that Peterson alleges May committed to memory.

With regard to May's notebook, Peterson contends that it presented evidence of May's "admission that notebooks contained information that he should have recorded into SalesLink, *** and [May] does not dispute that information, such as, customer names, preferences, customer quotes, market research, sales opportunities, and other competitively sensitive confidential business information, has commercial value." In Peterson's view, an objectively reasonable juror "could conclude that by keeping key competitive information in his private notebooks and not turning it over to his employer and then by destroying the sole record of this information when he was obligated to turn it over to Peterson, May failed to fulfill his responsibilities."

With regard to May memorizing Peterson's trade secrets, Peterson contends that it presented "undisputed evidence that May memorized Peterson's trade secrets from SalesLink" and notes that May was able to construct a partial list of Peterson and Modern customers and prospective customers from memory.[8]

As to evidence that May misappropriated—*i.e.*, used or disclosed—the information in the notebook and the information that May purportedly memorized from SalesLink, Peterson points to evidence that "May generated *** $7,500,000 in sales and rentals as of December 2018 from Peterson['s] Eugene store's customers for Modern Machinery," and "Modern Machinery's Eugene store opened 12 new accounts for Peterson's customers after May joined." It also points to the notes that May made in Modern's customer relations management system: two noting customers'

_____

[8]  With regard to May's use of SalesLink prior to his departure from Peterson, as noted, Peterson submitted an affidavit averring that May "spent a considerable amount of time after work hours searching for and reviewing a variety of customer and prospective customer lists as well as other trade secret information in SalesLink" which "served no apparent work purpose." As also noted, given the summary judgment record in this case, Peterson did not meet its burden to adduce evidence from which a reasonable finder of fact could determine that the mere identities of Peterson customers were trade secrets under ORS 646.461. With regard to the averment that May viewed other "trade secret" information, we have explained that "conclusory restatements of ultimate facts are not 'specific facts showing that there is a genuine issue *** for trial.'" *Greer v. Ace Hardware Corp.*, 256 Or App 132, 141, 300 P3d 202 (2013) (quoting ORCP 47 D; omission in *Greer*).

"typical" needs and one noting that a customer had "rented a ton of equipment" from May in the past.

In our view, Peterson failed to adduce evidence from which a reasonable factfinder could determine that May or Modern misappropriated—that is, used or disclosed—trade secrets contained in May's notebook or May's memory.

As an initial matter, as noted above, Peterson did not adduce evidence from which a reasonable finder of fact could determine that the mere identities of Peterson customers were trade secrets. The *Restatement* explains:

> "If the identities of the former employer's customers are not protectable as a trade secret, a former employee is entitled, absent an enforceable agreement to the contrary, to solicit the customers in competition with the former employer once the employment has ended. *** If the customer list or related information does not qualify for protection as a trade secret, the former employer should ordinarily be limited to the protection available through a reasonable covenant not to compete."

*Restatement* § 42 comment f.

As set forth in the *Restatement*, absent an enforceable covenant not to compete (or an enforceable nonsolicitation agreement), May was entitled to solicit Peterson customers while working for Modern, as long as he did not misappropriate—*i.e.*, use or disclose—trade secret information when doing so.[9] In our view, evidence that May was a

---

[9] Peterson and May did enter into a noncompetition agreement. The trial court, however, determined that agreement to be unenforceable. *See* ORS 653.295 (setting forth requirements for noncompetition agreements in Oregon).

Peterson and May *did not* have a nonsolicitation agreement, which the "Oregon Supreme Court has explained *** will often be enforceable against salespersons and agents, who 'are generally hired and paid a salary in order that they may help build up custom, getting acquainted with customers and acquiring their good will.'" *Oregon Psychiatric Partners v. Henry*, 293 Or App 471, 477, 429 P3d 399 (2018) (*Oregon Psychiatric*) (quoting *Kelite Prod., Inc. v. Brandt et al*, 206 Or 636, 652, 294 P2d 320 (1956)). We note that covenants not to "solicit or transact business with customers of the employer" are exempted from the requirements in ORS 653.295(1) and (2) that are applicable to noncompetition agreements. ORS 653.295(4)(b).

The *Restatement* does note that "[a] few courts, particularly in delivery route cases, have *** enjoined *** solicitation when the former employee had developed substantial personal relationships with the customers." *Restatement* § 42 comment f. The *Restatement* goes on to note, however, that "such a prohibition

successful salesperson at Modern and that May's previous working relationships "entered into [his] thought process" are insufficient to demonstrate a genuine issue of material fact as to whether May or Modern used or disclosed Peterson's trade secrets while working at Modern.

The question maybe becomes closer when consideration is given to the three notations in Modern's customer relations management system regarding the three customers with whom May had previously worked with at Peterson, which we understand Peterson to point to on appeal.

In our view, however, given that May was entitled to and did solicit those customers, customer information of the sort contained in two of those notations—*i.e.*, what the customer typically needs and whether there is a sales opportunity, which is the type of information May obtained on sales calls—is insufficient to demonstrate a genuine issue of material fact as to whether May or Modern used or disclosed Peterson's trade secrets while working at Modern. Further, in light of our conclusion that Peterson did not adduce evidence from which a reasonable finder of fact could determine that the mere identities of Peterson customers were trade secrets, we do not view May's notation that he had previously rented equipment to a particular customer to demonstrate a genuine issue of material fact as to whether May or Modern used or disclosed Peterson's trade secrets while working at Modern.

In the end, we note that Peterson is perhaps correct that May was aware of certain Peterson trade secrets when he left employment at Peterson; May worked for Peterson

---

can unfairly limit employee mobility," and, as noted above, states that, "[i]f the customer list or related information does not qualify for protection as a trade secret, the former employer *should ordinarily* be limited to the protection available through a reasonable covenant not to compete." *Id.* (emphasis added). We are persuaded that employers "should ordinarily" be limited to the protection available through a reasonable covenant not to compete (or, if applicable, a nonsoliciation agreement). We also emphasize that, as noted above, covenants not to "solicit or transact business with customers of the employer" are exempted from the requirements in ORS 653.295(1) and (2) imposed on noncompetition agreements, ORS 653.295(4)(b), and that the "Oregon Supreme Court has explained [that nonsolicitation agreements] will often be enforceable against salespersons and agents." *Oregon Psychiatric*, 293 Or App at 477 (citing *Kelite Prod., Inc.*, 206 Or at 652).

for 11 years and had access to SalesLink, which contained detailed information about Peterson customers. But we also note that "equity has no power to compel a man who changes employers to wipe clean the slate of his memory." *Peerless Pattern Co. v. Pictorial Rev. Co.*, 147 AD 715, 717, 132 NYS 37 (NY App Div 1911). May's ability to remember information that he learned when he was working at Peterson and evidence of his continued use of his relationships that he developed while working as an employee of Peterson are insufficient to create a genuine issue of material fact to support a claim of misappropriation of trade secrets.

## IV.   CONCLUSION

In light of the foregoing, we conclude that the trial court did not err in granting summary judgment to May and Modern on Peterson's claim for misappropriation of trade secrets. Therefore, we affirm.

Affirmed.